1 | Charles H. McCrea, Jr.
2 | **HEJMANOWSKI & McCREA LLC**
520 South 4th Street, Suite 320
3 | Las Vegas, NV 89101
Telephone (702) 834-5262
4 | Fax: (702) 834-5262
E-mail: chm@hmlawlv.com
5 |
6 | Andrew B. Lustigman (admitted pro hac vice)
**OLSHAN FROME WOLOSKY LLP**
7 | Park Avenue Tower
65 East 55th Street
8 | New York, NY 10022
Telephone: (212) 451-2258
9 | Fax: (212) 451-2222
E-mail: alustigman@olshanlaw.com
10 |
11 | *Attorneys for Defendants Health Nutrition*
*Products, LLC, Howard Raff, and David Raff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

FEDERAL TRADE COMMISSION,

           Plaintiff,

      -v.-

CRYSTAL EWING, individually and as a
director or officer of Classic Productions, LLC;

CLASSIC PRODUCTIONS, LLC, a Nevada
limited liability corporation;

GLOBAL ACCESS MANAGEMENT
SYSTEMS, INC., a Nevada company, also
d/b/a Citra-Slim 4;

RICKI BLACK, individually and as an officer
or director of Global Access Management
Systems, Inc.;

HEALTH NUTRITION PRODUCTS, LLC,
a Delaware limited liability company, also,
d/b/a HNP LLC, d/b/a W8-B-Gone, and
d/b/a Quick & Easy;

HOWARD RAFF, a/k/a HOWARD BRUCE,
individually and as an officer of director of
Health Nutrition Products, LLC;

**Case No. 2:14-cv-00683-RFB-VCF**

**THE HNP DEFENDANTS'
MEMORANDUM IN OPPOSITION
TO PLAINTIFF'S MOTION
<u>FOR SUMMARY JUDGMENT</u>**

3330055-2

1  DAVID RAFF, individually and as a *de facto*
   officer or director of Health Nutrition
2  Products, LLC;

3  OMNI PROCESSING CENTER, a
   Nevada company,

4
   MBE MANAGEMENT LLC, a Nevada
5  limited liability Company;

6  SHIRLEY MURPHY, individually and as a
   director or officer of Omni Processing Center;

7
   and
8
   RONALD BOYDE, individually and as
9  a director or officer or Omni Processing
   Center and a *de facto* director or officer
10 of MBE Management LLC,

11                                Defendants.

1

**TABLE OF CONTENTS**

2

INTRODUCTION ....................................................................................................1

3

COUNTERSTATEMENT OF MATERIAL FACTS ........................................................2

4

SUMMARY JUDGMENT STANDARDS ..................................................................10

5

6

THE FEDERAL TRADE COMMISSION IS NOT ENTITLED TO SUMMARY
JUDGMENT AGAINST THE HNP DEFENDANTS .................................12

7

     A.    HNP DID NOT CREATE THE ADVERTISEMENTS AT ISSUE ............12

8

     B.    THE COMMON ENTERPRISE CONCEPT CANNOT EXTEND
TO HNP ......................................................................................................14

9

10

          1.    THE COMMISSION FAILS TO ESTABLISH THE
ELEMENTS OF A COMMON ENTERPRISE
INVOLVING HNP..........................................................................14

11

12

          2.    THE COMMISSION RELIES ON INAPPLICABLE
CASE LAW .....................................................................................16

13

          3.    HNP CANNOT BE A PART OF A COMMON
ENTERPRISE THAT BEGAN YEARS BEFORE IT

14

              CAME INTO EXISTENCE ...............................................................18

15

     C.    THE RAFFS ARE NOT SUBJECT TO INDIVIDUAL
LIABILITY..................................................................................................19

16

          1.    THE HIGH STANDARD FOR INDIVIDUAL LIABILITY ..........19

17

          2.    THERE IS AN EVEN HIGHER STANDARD FOR
INDIVIDUALRESTITUTION WHICH CANNOT BE

18

              MET IF THE INDIVIDUALACTS WITH GOOD FAITH.............21

19

          3.    THE INGREDIENTS HAVE ACTUAL WEIGHT-LOSS

20

              PROPERTIES....................................................................................23

21

     D.    THE COMMISSION OVERSTATES ........................................................25

22

     THE AMOUNT OF THE ALLEGED CONSUMER HARM .................................25

23

CONCLUSION.....................................................................................................27

24

25

26

27

28

3330055-2

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...........................................................................................................10, 11

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...................................................................................................................10

*CFTC v. Wall Street Underground, Inc.*,
281 F.Supp.2d 1260 (D.Kan. 2003)....................................................................................16, 17

*E.I. du Pont de Nemours & Co. v. FTC*,
729 F.2d 128 (2d Cir. 1984) ......................................................................................................19

*FTC v. Amy Travel Service, Inc.*,
875 F.2d 564 ........................................................................................................................19, 25

*FTC v. Benning*,
No. C 09-03814 RS, 2010 WL 2605178 (N.D. Cal. June 28, 2010) ...........................................19

*FTC v. Garvey*,
383 F.3d 891 (9th Cir. 2004) ........................................................................................20, 21, 22

*FTC v. Gill*,
265 F.3d 944 (9th Cir. 2001) .....................................................................................................19

*FTC v. Gill*,
71 F. Supp. 2d 1030 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001) ...............................11

*FTC v. Grant Connect, LLC*,
763 F.3d 1094 (9th Cir. 2014) ...................................................................................................17

*FTC v. Grant Connect, LLC*,
827 F.Supp.2d 1199 (D. Nev. 2011)..........................................................................................16

*FTC v. Hang-Ups Art Enterprises, Inc.*,
1995 U.S. Dist. Lexis 21444 (C.D. Cal. Sept. 27, 1995)...........................................................23

*FTC v. Health Formulas, LLC*,
2015 WL 2130504 (D.Nev. May 6, 2015)..................................................................................16

*FTC v. Ivy Capital, Inc.*,
11-cv-283 JCM, 2013 WL 1224613 (D.Nev. Mar. 26, 2013) ..............................................14, 16

*FTC v. Johnson*,
10-cv-2203, 2015 WL 1471329 (D.Nev. March 31, 2015) ........................................................11

*FTC v. Kitco of Nevada, Inc.*,
612 F.Supp. 182 (D.Minn. 1985)...............................................................................................19

*FTC v. Kuykendall*,
    371 F.3d 745 (10th Cir. 2004) ...................................................................................25

*FTC v. Magui Publishers, Inc.*,
    *No.* Civ. No. 89-3818, 1991 WL 90895 at *12 (C.D. Cal. Mar. 28, 1991) .................26

*FTC v. Medical Billers Network, Inc.*,
    543 F.Supp.2d 283 (S.D.N.Y. 2008) ........................................................................21

*FTC v. Medicor LLC*,
    217 F. Supp.2d 1048 (C.D. Cal. 2002) .....................................................................23

*FTC v. Nat'l Urological Group, Inc.*,
    645 F.Supp.2d 1167 (N.D. Ga. 2008).......................................................................16

*FTC v. Network Services Depot, Inc.*
    617 F.3d 1127 (9th Cir. 2010) .................................................................................16

*FTC v. Patriot Alcohol Testers, Inc.*,
    798 F. Supp. 851 (D.Mass. 1992) ............................................................................23

*FTC v. Publishing Clearing House, Inc.*,
    104 F.3d 1168 (9th Cir. 1996) .....................................................................19, 20, 21

*FTC v. Security Rare Coin & Bullion Corp.*,
    931 F.2d 1312 (8th Cir. 1991) .................................................................................25

*FTC v. Solomon Trading Co., Inc.*,
    Civ. 91-1184-PXH-SMM, 1994 WL 421478 (D. Ariz. June 28, 1994)......................26

*FTC v. Swish Marketing*,
    No. C 09-03814 RS, 2010 WL 653486 (N.D. Cal. Feb. 22, 2010) ......................19, 20

*FTC v. Vacation Property Services*,
    No. 11-cv-00595, 2012 WL 1854251 (M.D. Fla. May 21, 2012) .............................15

*FTC v. Wetherill*,
    1993 WL 563621 (C.D. Cal. May 14, 1993) .............................................................25

*FTC v. Wetherill*,
    1993 WL 264557 (C.D. Cal. June 10, 1993) ........................................................25, 26

*FTC v. Wolf*,
    No. 94–Civ-8119, 1996 WL 812940 (S.D. Fla. Jan.31, 1996)..................................14

*Kaiser Cement Corp. v. Fishbach & Moore, Inc.*,
    793 F.2d 1100 (9th Cir. 1986) .................................................................................11

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,
    210 F.3d 1099 (9th Cir.2000) ..................................................................................11

iii

*P.F. Collier & Son Corp. v. FTC*,
    427 F.2d 261 (6th Cir.1970) ................................................................................14

*Sperry & Hutchinson Co.*,
    405 U.S. 233 (1972)..........................................................................................19

*United States v. Bldg. Inspector of Am., Inc.*,
    894 F.Supp. 507 (D. Mass. 1995)...................................................................20

**STATUTES**

FTC Act. .............................................................................................. passim

**OTHER AUTHORITIES**

Fed.R.Civ.P. 56(c) ................................................................................10

3330055-2

**INTRODUCTION**

The Federal Trade Commission ("Commission" or "FTC") moves for summary judgment against defendants Health Nutrition Products, LLC ("HNP"), David Raff and Howard Raff (collectively "the HNP Defendants"), accusing them of false, misleading and unsubstantiated claims in advertisements for a weight-loss product sold under different names.  The Commission can prevail on this motion <u>only</u> if the Court extends the concept of a common enterprise beyond anything currently recognized in our jurisprudence.  The Court should reject the FTC's attempt.

The Commission represents it has reached a settlement with defendants Crystal Ewing and Classic Productions, LLC ("Classic").  Although the terms of the settlement have not been provided to the HNP Defendants, Ewing admitted under the penalty of perjury that she was the primary actor and moving force behind the events alleged in the Amended Complaint.  In her Declaration, Ewing represents that she designed the single product at issue, which was sold under three different names and also that she created and initially disseminated the advertisements at issue.  This was done by 2007, years before HNP even came into existence.  Neither David nor Howard Raff is alleged to be a *de facto* owner of any company in this lawsuit other than HNP.  Ewing now admits she had no proof of the advertised claims, but at the time HNP became involved in late 2010, Ewing assured the HNP Defendant and others  that the pre-existing claims were fully substantiated.

Unable to sustain its burden of proof against the HNP Defendants, the Commission has concocted a theory of common enterprise liability.  To the extent there was any common enterprise, it was between Ewing, Ronald Boyde, and Shirley Murphy, who serviced the products at issue, and their overlapping corporate entities.  Ewing, Boyde and Murphy all knew each other, and all worked together in Nevada.  HNP came into existence more than three years after Ewing, Boyde and Murphy created and sold the product, and HNP has always remained a separate and distinct entity from any company associated with the Ewing, Boyde or Murphy.

The evidence shows, or at the very least creates an issue of material fact, that the HNP Defendants played no role in creating the advertising that forms the basis of this action.  When the HNP Defendants became involved years later with Ewing, Murphy and Boyde, they could have and

3330055-2

1   should have insisted that Ewing provide them with substantiation for the previously existing

2   weight-loss claims, but the fact remains that the advertisements and product were creations of

3   Ewing and Ewing alone.

4   This motion must also be denied with respect to the Raffs individually.  First, they can only

5   be held liable if HNP was part of a common enterprise, which it was not.  Second, there is a higher

6   standard for obtaining restitution from individuals such as the Raffs, a standard the Commission

7   has not met.  Howard and David Raff did not create the advertisements in question, had no

8   knowledge of their falsity and did not intentionally avoid the truth.  Defendant Ewing designed the

9   product and advertising at issue; defendants Murphy and Boyde were the original marketers of W8-

10  B-Gone and even after they assumed a reduced role, they continued to receive all customer

11  complaints and mail concerning the product.  There was also a significant amount of second- and

12  third-time purchasers, a significant indication of customer satisfaction.  The evidence obtained in

13  discovery shows that HNP provided money to Murphy and Boyde for them to issue refunds, but

14  that the Raffs at all times were separated by several degrees, both physically and organizationally,

15  from consumers, from the advertisements, and from the actions of Murphy, Boyde and Ewing and

16  their network of companies.

17  If the Court is not prepared to deny summary judgment against the HNP Defendants based

18  on this submission, it should at the very least hold its decision in abeyance until the terms of the

19  settlement between the Commission and other defendants in this action—and the admissions

20  contained therein— become known and the HNP Defendants afforded a reasonable opportunity to

21  assess and argue the settlements' implications.

22  <u>**COUNTERSTATEMENT OF MATERIAL FACTS**</u>

23  1.      HNP did not exist until October 2010.  ECF Doc. #73-1 (Plaintiff's Memorandum In

24  Support Of Summary Judgment (hereinafter, "FTC Mem.")) at 14; ECF Doc. #73-86 (HNP

25  Certificate of Formation) at 3.

26  2.      David and Howard Raff are based in Florida.  Deposition of David Raff (Exhibit A

27  to the Declaration of Andrew B. Lustigman, Esq. (hereinafter, "Lustigman Decl.")) at 13:22;

28  Deposition of Howard Raff (Lustigman Decl., Ex. B) at 8:3-5.

2

3.     Defendants Shirley Murphy, Ronald Boyde and Crystal Ewing, Classic Productions, LLC ("Classic"), Omni Processing Center ("Omni") and MBE Management, LLC ("MBE" or "MBE Management") are/were all Nevada based.  FTC Mem. at 11:15; 13:16; 14:1.

4.     Murphy, Boyde and Ewing worked together at Classic, which Ewing owned since at least 2007.  ECF Doc. #73-64 (Declaration of Crystal Ewing (hereinafter, Ewing Decl.")) at ¶¶8, 9; FTC Mem. at 2:2-10.

5.     As shown below, Classic, Omni and MBE Management all had ownership, management and/or employees that overlapped with each other but not with the HNP Defendants. Deposition of Shirley Murphy (Lustigman Decl., Ex. C) at 193:8-10.  None of the HNP Defendants are alleged to have any ownership interest, *de facto* or otherwise, in Classic, and in fact they do not.

6.     Ewing formed defendant MBE Management, LLC in 2006 for the purpose of marketing W8-B-Gone.  Ewing Decl. at ¶5.  None of the HNP Defendants are alleged to have any ownership interest, *de facto* or otherwise, in MBE, and in fact they do not have any ownership interest.

7.     MBE was named after its partners, Murphy ("M"), Boyde ("B") and Ewing ("E"). *Id.*

8.     The nominal head of MBE was Francie Betts, the mother of defendant Boyde's children, who was named as an MBE officer because Boyde owed her child support obligations. Deposition of Ronald Boyde (Lustigman Decl. at Ex. D) at 65:8-18; *Id.* at 68:3-11.

9.     None of the HNP Defendants had any ownership interest in MBE.  Deposition of Shirley Murphy at 194:12-195:7.

10.    Omni was formed by defendants Murphy and Boyde in February 2010.  FTC Mem. at 3:2; Deposition of Shirley Murphy at 185:21.

11.    None of the HNP Defendants are alleged to have any ownership interest, *de facto* or otherwise, in Omni and in fact they do not.  Deposition of Shirley Murphy at 185:22-186:2.

12.    Defendants Ricki Black and Global Access Management Systems, Inc. are not alleged to be a part of any common enterprise with the HNP Defendants and therefore they are not discussed any further in this memorandum.  FTC Mem. at 18:11-24.

3330055-2

13.      Crystal Ewing formulated the product at issue by herself in cooperation with a laboratory.  Ewing Decl. at ¶¶19, 24.

14.      W8-B-Gone and Quick & Easy (and Citra-Slim 4) were all identical products except for the color of the pill.  FTC Mem. at 4:14; Ewing Decl. at ¶24.

15.      The content for the W8-B-Gone website (attached Exhibit D to the Amended Complaint) was fully created and supplied by Ewing.  Ewing Decl. at ¶31; ECF Doc. #73-69 (Declaration of Dennis J. Hunsaker (hereinafter, "Hunsaker Decl.") at ¶18.

16.      HNP was not involved in the W8-B-Gone website creation.  *Id.*

17.      There never was a website for Quick & Easy.  FTC Mem. 10:4-5.

18.      Ewing was the person who designed the mail solicitations for W8-B-Gone.  Ewing Decl. at ¶¶8, 32.

19.      The W8-B-Gone mail solicitation, which was designed by Ewing, stated that the product was available only from MBE Management.  Am. Comp., Ex. C (ECF Doc. #17-1) at 13.

20.      HNP was not mentioned or identified anywhere on the W8-B-Gone mail solicitation.  *Id.*

21.      No other mail solicitation for W8-B-Gone was ever used—only that one.  Lustigman Decl., Ex. Q (HNP Deposition) at 44:7.

22.      Ewing, Murphy and Boyde commenced selling W8-B-Gone under their MBE business "before 2007", at least three years before HNP came into existence.  ECF Doc. #73-4 (Ewing's Responses To Plaintiff's Written Requests And First Demand For Production Of Documents (hereinafter, "Ewing Discovery Responses") at ¶8, 9; FTC Mem. at 4:14 (FTC incorrectly states "Defendants" began selling in 2007 when HNP was not even in existence yet); ECF Doc. #73-86 (HNP Certificate of Formation).

23.      The 2007 (or "before 2007") start date for W8-B-Gone sales is at least three years earlier than the 2010 date stated in the Commission's Summary Judgment memorandum.  FTC Mem. at 10:16.

24.      MBE's other two partners confirm they began marketing and selling W8-B-Gone years before HNP was even formed.  Lustigman Decl., Ex. A (David Raff Deposition) at 58:20;

1  Lustigman Decl., Ex. C (Murphy Deposition) at 179:15-17; Lustigman Decl., Ex. D. (Boyde

2  Deposition); 129:24.

3          25.     MBE admits the HNP Defendants had no involvement with MBE at the time it

4  commenced selling and marketing W8-B-Gone—Crystal Ewing was the "brains" of MBE.  ECF

5  Doc. #73-24 (Murphy Deposition) at 18; ECF Doc. #73-23 (Boyde Deposition) at 8.

6          26.     Documentary evidence bears out the testimony of the MBE partners that W8-B-

7  Gone was an MBE product as early as 2007: MBE held itself out as MBE Management d/b/a W8-

8  B-Gone in 2007 in multiple documents, including its Limited Liability Authorization Resolution.

9  Lustigman Decl., Ex. E (FTCCEDN0030204).

10          27.     MBE also completed a Merchant Application And Agreement for CardService

11  International that was submitted in January 2007 and approved in February 2007.  In this

12  document, MBE identified itself as W8-B-Gone.  Defendant Crystal Ewing is listed as the

13  authorized business representative and her e-mail address and the website address she registered are

14  supplied in the section titled "Merchant Information."  Lustigman Decl., Ex. F

15  (FTCCEDN0028684).

16          28.     Since January 2007, W-B-Gone has been a registered trade name, or d/b/a, of MBE.

17  In January 2007, MBE registered the trade name with the State of Nevada by filing a Certificate of

18  Fictitious Firm Name.  Lustigman Decl., Ex. G (FTCCEDN0030208).

19          29.     MBE applied for a Las Vegas business license in January 2007 and described its

20  business as "retail sales of weight loss, health care and dietary supplements through magazines,

21  package inserts, mail and Internet."  Lustigman Decl., Ex. H (FTCCEDN0030211).

22          30.     MBE's Las Vegas Business License was issued in January 2007 to MBE's Francie

23  Betts in the name of "W8 B Gone."  Lustigman Decl., Ex. I (FTCCEDN0030213).

24          31.     In February 2007, MBE opened a bank account in the name of "MBE Management

25  LLC DBA W8-B-Gone."  Lustigman Decl., Ex. J (FTCCEDN0030227-229).

26          32.     The W8-B-Gone bottle listed Classic's telephone number for all inquiries.  FTC

27  Mem. at 15:1.

28

33.     When Ms. Ewing was asked, under penalty of perjury, to identify those involved in the marketing of W8-B-Gone, she identified MBE Management and Classic Production.  Ewing Discovery Responses (ECF Doc. #73-4) at ¶11.  She did not identify HNP.  *Id.*

34.     MBE remained open through at least September 2010 and continued to market W8-B-Gone through that time.  Am. Comp., Ex. C (ECF Doc. #17-1) at 14 ("W8-B-Gone Division, MBE Management"); Boyde Deposition (Lustigman Decl., Ex. D) at 144:18-25; Lustigman Decl., Ex. K (FTCCEDN0030203).

35.     There were only two methods of marketing W8-B-Gone: direct mail and two Internet websites.  FTC Mem. at 10:22-23.

36.     Ewing registered the only two websites used to market W8-B-Gone: 123w8bgone.com and w8bgone.com, and both of them were pointed at a single, unified website.  Ewing Decl. (ECF Doc. #73-64) at ¶31.

37.     The W8-B-Gone website was set up and maintained by Ewing in April 2010, half a year before HNP came into existence.  FTC Mem. at 14:6-18.

38.     The W8-B-Gone website listed the P.O. Box 3913 address in Las Vegas, and identified Crystal Ewing as the contact person.  Am. Comp., Ex. D (ECF Doc. #17-1) at 21.

39.     Ewing retained Digital Matrix International ("DMI") to host the Citri-Slim 4 and W8-B-Gone websites, which DMI did.  Hunsaker Decl. (ECF Doc. #73-69) at ¶16.

40.     The only post office box used to accept orders for W8-B-Gone was P.O. Box 3913 in Las Vegas, Nevada.  That post office box was registered by Ms. Ewing in 2005 and defendants Murphy and Boyde were the only ones who had access to that post office box.  Am. Comp., Ex. D (ECF Doc. #17-1) at 21 ("P O Box 3913"); ECF Doc. #73-66 (Declaration of Andrea Avery) at Ex. A ("Box 3913"); Ewing Decl. (ECF Doc. #73-64)  at ¶30; Lustigman Decl., Ex. C (Murphy Deposition) at 186:18.

41.     HNP sold other products, including Neutravive with which the Nevada-based defendants had no involvement.  Lustigman Decl., Ex. A (David Raff Deposition) at 162:11-22; *Id.* at Ex. B (Howard Raff Deposition) at 27:6-12.  Thus, HNP's "sole purpose" was not to serve the Nevada-based Defendants (Ewing, Murphy, Boyde, Classic, MBE and Omni).

42.     David Raff did not "fund" W8-B-Gone (FTC Mem. at 3:8).  Rather, years after the product was created, Crystal Ewing transferred her interest/ Classic's interest in the products and advertising to HNP in consideration for debts that MBE owed.  Ewing Decl. (ECF Doc. #73-64) at ¶23; Lustigman Decl., Ex. A (David Raff Deposition) at 64:3-12; 65:18-21; 67:9-68:3.

43.     All of the business dealings between Ewing, Murphy and Boyde and their respective companies remained the same, and they continued operating under the same system and terms that were "already set up" by Ewing and Classic and Murphy and Boyde "just ran with it."  Lustigman Decl., Ex. C (Murphy Deposition) at 102:14-103:19.

44.     Crystal Ewing created the advertising and claims for the product.  Lustigman Decl. at Ex. A (David Raff Deposition) at 66:12-67-4; Ewing Decl. (ECF Doc. #73-64) at ¶8 (Ewing creates Citra-Slim ad) and ¶23 (Ewing used Citra-Slim ad copy to sell W8-B-Gone pills).

45.     Ewing found herself in debt and sought to leverage the W8-B-Gone product to alleviate her debt.  Lustigman Decl. at Ex. A (David Raff Deposition) at 137:7-13;

46.     In early 2011 Ewing transferred the advertising for W8-B-Gone that she created directly over to the company that printed the mail pieces.  Lustigman Decl. at Ex. L, at FTCCEDN0157050 (Michael Ladomersky writes, "Hi Crys, here's the W8-B-Gone art files.  They are pretty big so you have to download it on to your computer"); *Id.* at FTCCEDN0157049 (Ian Gamberg of Print & Direct Mail Services and Consulting receives advertising copy and directs that they be resized); *Id.* at FTCCEDN0157047-48 (Ian Gamberg directs additional changes to advertising); and *Id.* at FTCCEDN0157046 (David Raff receives e-mail from Ian Gamberg on January 20, 2011 and notes that the client has approved the new proof).

47.     Crystal Ewing represented to multiple parties, including to David Raff at the time of the transaction, that the claims for her weight loss products were substantiated by scientists' studies.  Hunsaker Decl. (ECF Doc. #73-69) at ¶16; Lustigman Decl. at Ex. A (David Raff Deposition) at 55:13-17; 62:24-63-7.

48.     In 2015, Ewing first admitted her representations that she possessed substantiations for the claims were untrue.  Ewing Decl. (ECF Doc. #73-64) at ¶25.

49.     In addition to Ewing's representations that the weight loss claims for her products were substantiated, David Raff researched the ingredients on his own and determined the ingredients assisted in weight loss.  Lustigman Decl. at Ex. A (David Raff Deposition) at 56:5-57:2; Lustigman Decl., Exhibit R (examples of supporting information concerning the ingredients).

50.     David Raff also used W8-B-Gone personally, and experienced great success with it, losing more than 20 pounds.  Lustigman Decl. at Ex. A (David Raff Deposition) at 61:19-21.

51.     The only post office box used to accept orders for Quick & Easy was P.O. Box 280 in Hurricane, Utah.  That post office box was registered by Murphy's sister, Lyn Averett in 2011.  FTC Mem. at 18:7; Declaration of Andrea Avery (ECF Doc. #73-66) at Ex. B.

52.     Averett was the only one who had access to the Quick & Easy post office box, and she delivered the contents to Murphy and Boyde at Omni for a fee.  FTC Mem. at 18:10.

53.     Ms. Averett never communicated with any of the HNP Defendants.  Lustigman Decl. at Ex. C (Murphy Deposition) at 176:6-11.

54.     All mail orders, including payment for Quick & Easy, were directed to, and were received by Omni at its Utah post office box.  Am. Comp., Ex. F (ECF Doc. #17-1) at 29.

55.     The telephone number listed in Quick & Easy advertisements belonged to Omni.  FTC Mem. at 18:12.

56.     Customer complaints regarding W8-B-Gone and Quick & Easy were answered at Omni's offices, which were run by Murphy and Boyde.  Lustigman Decl. at Ex. A (David Raff Deposition) at 114:23-115:14; Lustigman Decl. at Ex. C (Murphy Deposition) at 40:21-41:5.

57.     Omni, and Murphy specifically, handled all telephone and mail refunds for the product.  Lustigman Decl. at Ex. C (Murphy Deposition) at 154:16.

58.     Murphy represented and testified that it was Omni's policy to issue a refund to any customer who called to request one.  Lustigman Decl. at Ex. C (Murphy Deposition) at 184:22-185:2.  This was Omni's stated policy both prior to HNP's creation and after.  *Id.*

59.     Boyde never personally spoke with to David Raff and couldn't pick him out of a room of people.  Lustigman Decl. at Ex. D (Boyde Deposition) at 102:13.

60.     Howard Raff never spoke with Murphy, Boyde or Omni on behalf of HNP. Lustigman Decl. at Ex. B (Howard Raff Deposition) at 33:16-24.

61.     It appears that MBE maintained a bank account through at least September 2010. Lustigman Decl., Ex. K (account closed on 9/21/10).

62.     The HNP Defendants had no ownership in Classic.  Lustigman Decl. at Ex. C (Murphy Deposition) at 187:19.

63.     None of the HNP defendants shared any bank accounts, office space or employees with Classic.  Lustigman Decl. at Ex. C (Murphy Deposition) at 187:10-24.

64.     The HNP Defendants never formulated any of Classic's business practices, never conducted business as Classic and had no ability to control Classic.  Lustigman Decl. at Ex. C (Murphy Deposition) at 193:8-23.

65.     None of the HNP Defendants shared any bank accounts, office space or employees with Omni, Murphy or Boyde.  Lustigman Decl. at Ex. C (Murphy Deposition) at 187:10-24.

66.     The HNP Defendants never formulated any of Omni's business practices, never conducted business as Omni and had no ability to control Omni.  Lustigman Decl. at Ex. C (Murphy Deposition) at 191:16-192-11.

67.     None of the HNP Defendants have any ownership interest in MBE.  Lustigman Decl. at Ex. C (Murphy Deposition) at 194:12-195:7.

68.     None of the HNP Defendants shared any bank accounts, office space or employees with MBE.  Lustigman Decl. at Ex. C (Murphy Deposition) at 194:12-195:7.

69.     The HNP Defendants never formulated any of MBE's business practices, never conducted business as MBE and had no ability to control MBE.  Lustigman Decl. at Ex. C (Murphy Deposition) at 194:12-195:7.

70.     Consumers who paid for the product via PayPal were also able to get refunds directly from the PayPal account administered by HNP.  However, the amount of refund requests made through PayPal was so low that PayPal advised HNP it did not need to leave a reserve fund in the PayPal account to cover potential return requests.  Lustigman Decl., Ex. Q (HNP Deposition) at 75-8:11

1     71.    The Commission misstates, or misleadingly states, that "HNP paid David Raff

2  $177,141.89 for mailing services he provided through MDI Lists, as well as $372,892.25 between

3  April 2011 and November 2013." FTC Mem. at 23:1.  In fact, the payments were made to MDI

4  Lists, as shown by the checks themselves, including the deposit information on the reverse side.

5  *See* Lustigman Decl. at Exhibit M (David Raff Deposition, Exhibit 11).  While the checks were

6  merely addressed to David Raff, they were payable to MDI Lists and the back of the checks show

7  that they were in fact deposited into MDI List's bank account, not David Raff's personal account.

8  *Id.*  The distinction is significant because the Commission bears the burden of proof on this

9  motion, and it is the Commission that is seeking to disregard the presumption of corporate

10  separateness in several instances.

11     72.    Consistent with the information available at the time, as well as David Raff's

12  personal experience with the product, there was a very significant rate of customer satisfaction.

13  Lustigman Decl., Ex. C (Murphy Deposition) at 195:14-17.   Based on sales information supplied

14  to the Commission on February 3, 2015, David Raff was able to calculate that W8-B-Gone had

15  approximately 4788 repeat orders from returning purchasers.  *See* Exhibit A to the Declaration of

16  David Raff, submitted herewith.  Quick & Easy had an additional 1712 repeat purchases.  *Id.* at

17  Exhibit B.

18     73.    The total revenue from these repeat customer purchases is $312,007.02.  *See* Raff

19  Declaration at ¶15 (the repurchases often consisted of multiple bottles).  The number of repeat

20  purchases exceeds 10% of total product orders.  *Id.*

21                     **SUMMARY JUDGMENT STANDARDS**

22     A motion for summary judgment may not be granted unless the moving party establishes

23  there are no genuine issues of material fact to be determined and that the undisputed facts warrant

24  judgment for the moving party as a matter of law.  Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*,

25  477 U.S. 317, 322-23 (1986).

26     When ruling on a motion for summary judgment, a court may not determine issues of fact.

27  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  It is well-established that credibility

28  determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

1  facts are for trial, not for summary judgment motions and therefore should not be determined at this

2  stage.  *Anderson* at 255.

3      As the moving party, the Commission bears the burden of showing that there are no genuine

4  issues of material fact.  *FTC v. Gill*, 71 F. Supp. 2d 1030, 1037 (C.D. Cal. 1999), *aff'd,* 265 F.3d

5  944 (9th Cir. 2001).  Facts are construed in the light most favorable to the nonmoving party.

6  *Kaiser Cement Corp. v. Fishbach & Moore, Inc*., 793 F.2d 1100, 1103 (9th Cir. 1986).

7      "In order to carry its burden of production, the moving party must either produce evidence

8  negating an essential element of the nonmoving party's claim or defense or show that the

9  nonmoving party does not have enough evidence of an essential element to carry its ultimate

10  burden of persuasion at trial."  *FTC v. Johnson,* 10-cv-2203, 2015 WL 1471329, at *4 (D.Nev.

11  March 31, 2015) (citing *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.,* 210 F.3d 1099,

12  1102 (9th Cir.2000)).

13      The Commission has not met these exacting standards.  Material factual questions discussed

14  herein remain outstanding and the Commission has not negated essential elements of HNP

15  Defendants' claims.  Therefore, the summary judgment motion must be denied.

16

17

18

19      *[THE REMAINDER OF THIS PAGE HAS BEEN LEFT INTENTIONALLY BLANK]*

20

21

22

23

24

25

26

27

28

3330055-2

**LEGAL ARGUMENT**

**THE FEDERAL TRADE COMMISSION IS NOT**
**ENTITLED TO SUMMARY JUDGMENT AGAINST THE HNP DEFENDANTS**

The Commission overreaches by attempting to hold the HNP Defendants liable for violating the FTC Act. The Commission has failed to meet its burden of proof with respect to the HNP Defendants—in contrast to the group of Nevada-based defendants. Indeed, nearly all of the conduct supporting liability against the other defendants for the product marketed under the alternate names W8-B-Gone, Quick & Easy and Citra-Slim 4 occurred before HNP came into existence in October 2010. Because the Commission is not entitled to summary judgment against HNP, this motion must also be denied with respect to David and Howard Raff.

The Raff's alleged individual liability requires the Commission to make a two-part showing: first, it must demonstrate that HNP is liable for a violation of the FTC Act under a common enterprise theory; second, the Commission must prove individual liability of the Raffs for those corporations' actions. The Commission has failed on both accounts.

Independent of the failed common enterprise theory, David and Howard Raff should not be liable for the acts alleged in the Amended Complaint because they neither directly participated nor had any authority to control the advertising content created years prior by Crystal Ewing. Likewise, they lacked the requisite knowledge of the misrepresentations that Ewing now admits. The Commission's summary judgment motion simply does not meet the high standard necessary to hold the Raffs individually liable for restitution. At its core, this opposition seeks to hold the Commission to the burden of proof demanded by a summary judgment motion and precludes any finding of liability against the Raffs that does not satisfy the appropriate standard.

**A.   HNP DID NOT CREATE THE ADVERTISEMENTS AT ISSUE**

The Commission does not claim that HNP itself created any false, misleading or unsubstantiated advertisements. The three products in this case were in actuality a single product created by Ewing in 2006 or 2007 and sold under three different names. The product varied only as to pill color (and name). The Amended Complaint contains six causes of action against the HNP Defendants (Counts IV-IX). All of them relate to the advertised claims for which Ewing represented to HNP and others that she possessed substantiation.

3330055-2

1   Exhibit C to the Amended Complaint is an advertisement for W8-B-Gone that refers to

2   MBE as the seller of the product throughout.  *See* Am. Comp., Ex. C (ECF Doc. #17-1) at p. 13-14.

3   MBE stands for Murphy, Boyde, Ewing.  HNP is not mentioned anywhere in Exhibit C.

4   The product was sold on www.w8-b-gone, a website the Commission concedes was

5   created, set up and written by Ewing.  FTC Mem. at 3:5; Am. Comp., Ex. C (ECF Doc. #17-1) at

6   11, 13.  Digital Matrix International assisted Ewing in the creation of the website but was not

7   named as a defendant by the Commission.  Hunsaker Decl. (ECF Doc. #73-69) at ¶18.

8   Exhibit D to the Amended Complaint[1] consists of the content of the website.  It identifies

9   Ewing as the contact person and provides a mailing address to Classic's post office box and MBE's

10  telephone number.  *Compare* Am. Comp., Ex. D (ECF Doc. #17-1) at 21 *with* Classic's P.O. Box

11  application (both listing Box 3913) and Lustigman Decl., Ex. C (Murphy Deposition) at 170:24

12  (both identifying 1-800-763-5202 as W8-B-Gone customer service number answered by Murphy).

13  Also, the W8-B-Gone bottle listed Classic's telephone number for all consumer inquiries.

14  The Commission does not claim that HNP created the false, misleading or unsubstantiated

15  advertisement.  HNP is alleged to have processed consumer payments and financed some of the

16  direct mailings.  David Raff is alleged to own MDI Lists, which supplied names and addresses to

17  receive the direct mailings, and also to be a *de facto* part of HNP, but he is not alleged to have any

18  involvement in the creating the advertisements.  *Id.*  Howard Raff is accused of little more than

19  appearing on HNP's corporate papers.  FTC Mem. at 3:15.  As with David Raff, Howard Raff too

20  is not even alleged to have contributed in any way to the creation of the advertisements.

21  In essence, the Commission seeks to hold the HNP Defendants vicariously liable for the

22  acts of the Nevada-based defendants under the theory that they were involved in a common

23  enterprise.  Am. Comp. at ¶22-23.  To the extent the Commission argues in its reply papers that the

24  HNP Defendants are somehow directly liable, the actions of the Nevada-based defendants certainly

25

26  _____

27  [1] The Commission misstates the terms of the W8-B-Gone guarantee that was made by the Nevada-based defendants.  Contrary to the Commission's statement at page 7:5 of its summary judgment memorandum, Exhibit D to the Amended Complaint does not say "Guaranteed Results Or Your Money Back," either in capital or lower-case letters.

28

1    provide genuine issues of material fact that they (the Nevada-based Defendants) are the responsible

2    parties, and thus summary judgment should not be granted against the HNP Defendants.

3    **B.    THE COMMON ENTERPRISE CONCEPT CANNOT EXTEND TO HNP**

4          The Commission's claims for relief against David and Howard Raff are all predicated upon

5    successfully proving as a matter of law that HNP was part of a common enterprise that violated the

6    FTC Act.  In order to extend this principle to HNP, the Court must either factually conflate the

7    Nevada-based defendants' actions with HNP, or legally extend the common enterprise concept far

8    beyond its current legal boundaries.  The Court should do neither.

9          After conducting extensive discovery and exercising its broad investigatory powers, the

10   Commission has failed to present sufficient evidence to support its common enterprise  allegations

11   against HNP.  It has adduced no evidence whatsoever of common ownership, officers, managers, or

12   employees between the HNP Defendants and the Nevada-based defendants.  There is no dispute

13   that HNP is a completely separate corporate entity that has no common ownership with any of the

14   Nevada entities, and no ownership by any of the individual defendants (other than the Raffs, of

15   course).  HNP was formed, owned and ultimately dissolved by Howard Raff alone, not David Raff.

16   ECF Doc. # 73-86 at 4.

17         The general rule is that, absent highly unusual circumstances, the corporate entity will not

18   be disregarded." *P.F. Collier & Son Corp. v. FTC,* 427 F.2d 261, 266 (6th Cir.1970).  Against this

19   backdrop, it is the Commission's burden to overcome the presumption of corporate separateness.

20        **1.    THE COMMISSION FAILS TO ESTABLISH THE
               ELEMENTS OF A COMMON ENTERPRISE INVOLVING HNP**

21

22         The factors used by courts to evaluate whether a common enterprise exists include:

23   common control; the sharing of office space and officers; whether business is transacted through a

24   maze of interrelated companies; the commingling of corporate funds and failure to maintain

25   separation of companies; unified advertising; and evidence that reveals that no real distinction

26   exists between the corporate defendants.  *FTC v. Ivy Capital, Inc.,* 11-cv-283 JCM, 2013 WL

27   1224613, at *13 (D.Nev. Mar. 26, 2013) (common enterprise existed where, unlike here, four

28   defendants had common ownership interests in the entities); *FTC v. Wolf,* No. 94–Civ-8119, 1996

     WL 812940 at *7–8 (S.D. Fla. Jan.31, 1996) (common enterprise existed where, unlike here,

                                           14

1   corporate defendants were commonly controlled, shared office space and officers, commingled

2   corporate funds, etc.).

3           While many of these elements may exist for the Nevada-based defendants (Ewing, Murphy,

4   Boyde, Classic, MBE and Omni), they do not exist for the HNP Defendants:

5           The HNP defendants were not controlled by the Nevada defendants and the Nevada

6   defendants did not control HNP;

7           HNP shared no office space with any of the Nevada defendants;

8           HNP had no officers in common with the Nevada defendants;

9           HNP had no common ownership, nor was it otherwise interrelated with Classic, MBE or

10  Omni;

11          HNP's funds were not comingled with any of the other companies.  The Commission

12  presents no evidence of shared financial accounts.  Moreover, refund money was sent by check

13  from HNP to Omni rather than drawn from any common pool.  Lustigman Decl., Ex. Q (HNP

14  Deposition) at 93-5:13 (HNP made bi-monthly payments to Omni to cover refunds);

15          HNP was formed in a different state and remained separate from all other companies in this

16  case at all times;

17          The advertising for W8-B-Gone was not unified.  The Nevada-based defendants in this case

18  created and published the advertisements and marketed W8-B-Gone even before HNP came into

19  existence.  Am. Compl. at ¶25 (W8-B-Gone sold in January 2010); FTC Mem. at 13:30 (HNP

20  formed in October 2010); and

21          HNP never held itself out to consumers as being the same company as any other defendant

22  (as alleged in the Amended Complaint at ¶21).

23          Quite contrary to the Commission's attempt at including HNP in a common enterprise, it is

24  simply untrue that "no real distinction exists between the corporate defendants" in this case.  FTC

25  Mem. at 39:6.  Corporate distinctions were maintained at all times by the HNP Defendants, even if

26  the other defendants ignored them.  In *FTC v. Vacation Property Services,* No. 11-cv-00595, 2012

27  WL 1854251 (M.D. Fla. May 21, 2012) the Commission was denied summary judgment for similar

28  reasons, even though the defendant companies shared an overlapping executive and one company

15

1  used the name of the other.  *Id.* at *5 ("Many of these factors are absent or cannot be determined on

2  summary judgment.  There is a factual dispute as to whether VPS owned and exercised control

3  over TE and HLM.  The entities did not share office space, and the only overlapping officer

4  appears to have been Perry").

5       The evidence in this case demonstrates that HNP's activities do not fall within the

6  cognizable limits of a common enterprise.

7       **2.    THE COMMISSION RELIES ON INAPPLICABLE CASE LAW**

8       To prevail against HNP on this motion, the Commission asks this Court to extend the

9  concept of "common enterprise" well beyond the standard established by the applicable law.

10      A review of <u>every</u> case cited by the Commission in support of its common enterprise claim

11  (FTC Mem. at 38-39) shows precisely how far off-base the Commission is with respect to the HNP

12  Defendants.  <u>Every</u> single case cited by the Commission involves participants who had such

13  overlapping relationships and shared ownership, addresses, employees, etc. to the point where the

14  entities were virtually indistinct from each other:

15
   - *FTC v. Grant Connect, LLC,* 827 F.Supp.2d 1199, 1216 (D. Nev. 2011).  Factors
16     supporting common enterprise determination: "All the various offers were run by the
       same individuals using different company names.  Defendants changed entity names
17     and swapped and shared personnel... They both operated out of the same address using
       the same employees performing the same work."

18
   - *FTC v. Nat'l Urological Group, Inc.,* 645 F.Supp.2d 1167, 1182-83 (N.D. Ga. 2008).
19     Factors supporting common enterprise determination: "all three companies were under
       the common control of Wheat and Holda… Wheat served as the president and primary
20     decision maker of all three companies…Holda likewise served as an officer of all three
       companies… Wheat, Holda, and Smith ran the three companies out of the same office
21     space in an integrated fashion."

22
   - *FTC v. Network Services Depot, Inc.* 617 F.3d 1127, 1143 (9th Cir. 2010). Factors
23     supporting common enterprise determination: "Castro's companies pooled resources,
       staff, and funds; they were all owned and managed by Castro and his wife."

24
   - *FTC v. Health Formulas, LLC*, 2015 WL 2130504, at *6 (D.Nev. May 6, 2015). Factors
25     supporting common enterprise determination:  "the Receivership Entities were under
       common ownership, management, and control. The Temporary Receiver's analysis
26     indicates that Method Films, Inc., a company co-owned by the Millers, held a majority
       ownership interest in all but two of the thirty-six Receivership Entities… "
27
   - *FTC v. Ivy Capital, Inc.,* 2013 WL 1224613, at *13 (D.Nev. Mar. 26, 2013). Factors
28     supporting common enterprise determination: "Mr. Hoskins and his three partners…

16

had direct or indirect ownership interests in all entities that comprised the larger Ivy Capital Las Vegas group…For shared office space, almost all of the entities in the Ivy Capital Las Vegas group shared the same address."

None of the common enterprise factors relied upon by the Commission's cited authorities exist between the HNP Defendants and the Nevada-based defendants.  Neither David Raff nor Howard Raff had any shared interest, employees, office space or control of any enterprise in which the Nevada-based defendants were involved.  HNP's failure to acquire proof of pre-existing advertising claims does not constitute a common enterprise.

Having failed to establish the traditional standards of a common enterprise for HNP, the Commission unearths *CFTC v. Wall Street Underground, Inc.,* 281 F.Supp.2d 1260 (D.Kan. 2003) for the proposition that if one corporation's sole purpose is to serve another, a common enterprise must exist.  However, HNP's sole purpose was not to serve the Nevada-based defendants and the Commission can make no such showing. In fact HNP marketed another product, Neutravive, in which the Nevada-based defendants had no involvement. Raff Deposition at 162:11-22. Other products were also marketed by HNP that are not the subject of this action.

Additionally, the *Wall Street Underground* case is completely distinguishable for the following reasons:

The Commission does not advise the Court that in *Wall Street Underground,* the common enterprise participants were commonly controlled: "defendant Abrahams controls defendant WSU, and defendants Abrahams and/or WSU control Web." *Id.* at 1271.  Again, there is no common control or ownership between HNP or the Raffs on one hand, and Classic, Omni and MBE on the other hand.

Furthermore, the Commission's memorandum omits the dispositive portion of the *Wall Street Underground* holding: "individuals can only be part of a common enterprise when they act as a single economic unit with the other parties to the enterprise." *Id.*  Here, the Commission submits no evidence that the HNP Defendants were part of a greater "single economic entity." It submits no evidence of comingling accounts between the HNP Defendants and the Nevada-based defendants. Indeed, the Nevada-based defendants had to rely on HNP to send refund money, which it did.

17

3330055-2

1          While HNP was involved, and profited from the sale of the product, that is insufficient to

2 make HNP part of a common enterprise.  The Commission's motion papers reveal that other

3 businesses were also involved in the sale and marketing of the products.  For example, Digital

4 Matrix International maintained the W8-B-Gone website and provided software to process

5 purchases (Ewing Declaration at ¶11); Evolution Marketing Concepts managed the mailings and

6 printed the advertisements (ECF Doc. #73-70 (letter from Evolution Marketing Concepts));

7 Nutricap Labs manufactured the product (Ewing Declaration at ¶19).

8          Under the Commission's loose definition of common enterprise, virtually every relationship

9 with a vendor, including the three mentioned above, could be considered a common enterprise.

10      **3.**    **HNP CANNOT BE A PART OF A COMMON ENTERPRISE**
               **THAT BEGAN YEARS BEFORE IT CAME INTO EXISTENCE**

11

12          The Commission also fails to explain the passage of time between the creation of the W8-

B-Gone advertisements and involvement of HNP, a span of three to four years which precludes a

13 finding that the HNP Defendants participated in the so-called enterprise.

14          In *FTC v. Grant Connect, LLC,* 763 F.3d 1094 (9th Cir. 2014), the Ninth Circuit vacated

15 common enterprise liability for a defendant because he was not part of the planning of a false

16 advertising scheme:

17

18        Unlike the other schemes previously described, however, the evidence does not
        show that Kimoto controlled Vertek at the time the Acai Total Burn scheme was
        developed, nor does it show that he directly participated in the scheme. Kimoto

19        was incarcerated on April 18, 2008, whereas work on the Acai Berry scheme did
        not begin until February 2009. Accordingly, Kimoto cannot be held liable for

20        either injunctive relief or restitution with respect to the Acai Total Burn scheme.
        We vacate that part of the district court's grant of summary judgment and

21        permanent injunction based on Vertek's violations of the FTC Act in connection
        with the Acai Total Burn scheme. [763 F.3d at1104].

22

23          In this case, the Commission's summary judgment motion contains the same fatal flaws as

24 present in *Grant Connect*: Any common enterprises in this case were commenced in 2006-2007

25 when Crystal Ewing developed the product, created the advertising which she now admits lacks

26 substantiation, and began selling the identical weight-loss products with the aid of Murphy, Boyde

27 and their  interrelated companies.  All of these key occurrences predate the October 2010 formation

28 of HNP and there is no allegation of any involvement of the Raffs at that time.  Exhibit L to the

1  Lustigman Declaration is an e-mail chain that shows David Raff did not even receive the Ewing-

2  created W8-B-Gone advertisement until 2011, at which time he received it from a third-party

3  printer after having been assured by Ewing that she possessed substantiation dating back to 2006-

4  2007.  The Commission cites no authority for the proposition that a corporation can be participate

5  in a common enterprise years prior to the corporation's own creation.

6      Because the Commission's case against the HNP Defendants does not meet the standards

7  for a common enterprise, it is clear that, at the very least, material questions of fact exist as to

8  whether the HNP Defendants can be held liable under the Commission's common enterprise

9  theory.

10 **C.    THE RAFFS ARE NOT SUBJECT TO INDIVIDUAL LIABILITY**

11     Even if the Court finds that the other defendants lacked a reasonable basis for the advertised

12 claims, the Commission is still not entitled to summary judgment against David and Howard Raff

13 individually.  The Commission presents no evidence capable of holding the Raffs individually

14 liable for any activity alleged in the Amended Complaint.  Indeed, the Commission's evidence

15 proves the product was developed and the advertising created well before the Raffs ever became

16 involved with the Nevada-based defendants.  All of the affirmative evidence shows Ewing alone

17 admitting she created the product and advertisements without any substantiation and began selling

18 it with defendants Murphy and Boyde in 2007 at the latest.

19         **1.    THE HIGH STANDARD FOR INDIVIDUAL LIABILITY**

20     The Ninth Circuit has described the test for individual liability under the FTC Act as

21 "rigorous." *FTC v. Gill*, 265 F.3d 944, 958 (9th Cir. 2001). While the Commission has broad power

22 to define and identify deceptive business practices and to ensure they do not continue, its power is

23 not unlimited; rather, "appropriate standards must be adopted and applied to protect a respondent

24 against abuse of power [by the Commission]." *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d

25 128, 137 (2d Cir. 1984) (citing *Sperry & Hutchinson Co.,* 405 U.S. 233, 248 (1972)).

26     In order to establish individual liability under the FTC Act, the Commission must prove that

27 the individual participated directly in the acts or practices or had authority to control them. *FTC v.*

28 *Swish Marketing*, No. C 09-03814 RS, 2010 WL 653486, *3 (N.D. Cal. Feb. 22, 2010); (citing

19

1   *FTC v. Publishing Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1996)); *FTC v. Amy Travel*

2   *Service, Inc.*, 875 F.2d 564. 573 (9th Cir. 1989).

3        "More simply, the Commission must prove, first, corporate misrepresentations and, second,

4   an officer's knowledge of and authority to control whatever acts led to the corporate misconduct."

5   *FTC v. Benning*, No. C 09-03814 RS, 2010 WL 2605178, *4 (N.D. Cal. June 28, 2010).

6        The Commission's evidence shows that the Raffs did not, as required for individual

7   liability, participate directly in the practices in question or have the ability to control them. Direct

8   participation or ability to control means "active involvement with the business matters and

9   corporate policy related to the violation." *FTC v. Kitco of Nevada, Inc.,* 612 F.Supp. 182, 1292

10  (D.Minn. 1985).

11       The facts  of this case show, or at least create a material issue of fact, that the alleged

12  violations occurred three-plus years before the Raffs were involved in any capacity. There is no

13  allegation that the Raffs were actively involved in creating the advertisements at issue. Rather, the

14  Commission is striving for vicarious liability against them based on the actions of Ewing and her

15  companies.

16       The individual must be able to control the *unlawful conduct,* not some other aspect of the

17  business.  Case law shows that the Commission's evidence concerning the Raffs does not meet the

18  burden of proof on the issue of control.  In *United States v. Bldg. Inspector of Am., Inc.*, 894

19  F.Supp. 507 (D. Mass. 1995), the FTC was denied summary judgment against individuals who had

20  knowledge and even participated in making fraudulent and misleading disclosures to potential

21  franchise purchasers.  Defendant Finkelstone had "some knowledge" of the misrepresentations at

22  issue, but "the record is less than clear as to whether he participated directly in the practices or acts,

23  or had the authority to control them." 894 F.Supp. at 520 (internal quotation marks omitted).

24  "Although [Finkelstone] assisted TBIA's counsel in drafting parts of the [fraudulent documents],

25  the record does not reveal whether he was involved in drafting the sections at issue here, or whether

26  he had actual authority in the company to determine the final content[.]" *Id.* Those facts were

27  enough to deny the Commission's summary judgment motion with respect to Finkelstone in his

28  individual capacity. *Id.* at 522.

1    The Amended Complaint alleges that the Raffs formulated, directed and controlled the acts

2    that constitute the common enterprises (Am. Comp. at ¶¶22-23) but the Commission's summary

3    judgment motion fails to prove these allegations.

4    **2.    THERE IS AN EVEN HIGHER STANDARD FOR**
     **INDIVIDUAL RESTITUTION WHICH CANNOT BE**

5    **MET IF THE INDIVIDUAL ACTS WITH GOOD FAITH**

6    The Commission's burden on this motion is raised to an ever higher level because it seeks

7    restitution from the Raffs individually.  In *FTC v. Garvey*, 383 F.3d 891 (9th Cir. 2004), the Ninth

8    Circuit held that, in order "to hold an individual liable for restitution, the FTC must also show that

9    the individual had actual knowledge of the material misrepresentations, was recklessly indifferent

10   to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud

11   along with an intentional avoidance of the truth." 383 F.3d at 900 (citing *FTC v. Publishing*

12   *Clearing House, Inc.*, 104 F.3d 1168, 1170-71 (9th Cir. 1996)).  As more recently stated by Judge

13   Seeborg, "to recover restitution from an individual, the FTC must also prove 'knowledge that the

14   corporation or one of its agents engaged in dishonest or fraudulent conduct.'" *FTC v. Swish*

15   *Marketing*, No. C 09-03814 RS, 2010 WL 653486, *3 (N.D. Cal. Feb. 22, 2010) (quoting *FTC v.*

16   *Publishing Clearing House*, 104 F.3d at 1171).

17   Because of the knowledge requirement for individual liability, a defendant's good-faith

18   belief in the efficacy of a product, while not relevant to the question of whether a particular

19   representation violated the FTC Act, is highly relevant to whether a defendant can be held

20   individually liable for these misrepresentations. *FTC v. Garvey*, 383 F.3d at 896, 902 (no

21   participant liability); *FTC v. Medical Billers Network, Inc.,* 543 F.Supp.2d 283 (S.D.N.Y. 2008).

22   The Raffs' actions demonstrate not only that they had no actual knowledge that Ms. Ewing

23   lied about possessing substantiation supporting the claims, but also that the Raffs were not

24   recklessly indifferent to truth.  There is ample evidence of their good faith actions. The evidence is

25   summarized as follows:

26   a.    The product was designed and the advertisements created by Crystal Ewing without

27   any involvement from the Raffs. Ms. Ewing fully admits this and the Commission does not appear

28   to contend otherwise.

3330055-2

b.      At the time she was selling the product, Ewing represented that she possessed substantiation for the claims made in the advertisements. This is independently verified by the Hunsaker Declaration that was submitted by the Commission (Doc. # 73-69 at ¶16.

c.      The Raffs had no control, or any involvement whatsoever, with the creation, writing or hosting of the W8-B-Gone website, which was entirely a creation of Ewing and Digital Matrix International.  There was no website for Quick & Easy.

d.      Years later, and prior to HNP's involvement, David Raff independently researched the ingredients and found support for their weight-loss properties.  *See e.g.,* Lustigman Decl., Ex. R; Lustigman Decl. at Ex. A (David Raff Deposition) at 56:23-57:5; Lustigman Decl., Ex. Q (HNP Deposition) at 123:21-24.

e.      Although in hindsight he should have demanded that Ewing provide him with documentary proof of the substantiation she represented that she possessed, David Raff tried W8-B-Gone and it worked for him, resulting in significant weight loss. Lustigman Decl. at Ex. A (Raff Deposition) at 61:19-21.

f.      As set forth in David Raff's Declaration, there were strong indications of customer satisfaction evidenced by the significant amount of customer reorders.  There were 6500 repeat purchases totaling over $312,000.00. This figure significantly understates customer satisfaction as it does not include the original purchases (which are still being calculated, which is one of the reasons an extension of time was requested).

g.      It is undisputed that Omni (run by Murphy and Boyde) handled customer complaints and telephone refund requests. Murphy represented that Omni's policy was to issue refunds to anyone who requested one. Lustigman Decl. at Ex. C (Murphy Deposition) at 184:22-185:2.  The Commission presents no evidence that either of the Raffs did anything to frustrate consumer refund requests.

h.      HNP made bi-weekly payments to Omni for refunds, and Omni handled all day-to-day customer service issues other than PayPal. Lustigman Decl., Ex. Q (HNP Deposition) at 93-5:13.

3330055-2

1        i.     For the money received in HNP's PayPal account, consumers received refunds and

2  chargebacks by making requests to PayPal, much like a credit card issues refunds or chargebacks.

3  However, the amount of refund requests made through PayPal was so low that PayPal advised HNP

4  it did not need to leave a reserve fund in the PayPal account to cover potential return requests.

5  Lustigman Decl., Ex. Q (HNP Deposition) at 75-8:11. The Commission presents no evidence that

6  either of the Raffs did anything to frustrate or impede the PayPal refund process.

7        j.     Other refund requests or complaints arrived at Classic's post office box, e-mail

8  address and telephone number, to which it is undisputed that neither of the Raffs had any access.

9        k.     As described further in the following section, HNP's expert witness, Dr. Lawrence

10  Cheskin provided ample support that the ingredients in the product do assist in weight loss, even if

11  Ewing's claims were not substantiated as she represented at the time they were being made.

12        The Ninth Circuit has denied individual liability when there is far less evidence of a

13  defendant's good faith.  *See FTC v. Garvey*, 383 F.3d at 902 (anecdotal evidence of efficacy and

14  information that purported to present scientific bases for claims plus personal success with product

15  sufficient to avoid direct liability). Other cases further demonstrate the importance of an

16  individual's intent in FTC cases. *See, e.g., FTC v. Medicor LLC,* 217 F. Supp.2d 1048 (C.D. Cal.

17  2002) (denying motion to strike affirmative defense because good faith is relevant for determining

18  whether to issue a permanent injunction and whether to hold defendants individually liable); *FTC*

19  *v. Hang-Ups Art Enterprises, Inc*., 1995 U.S. Dist. Lexis 21444 (C.D. Cal. Sept. 27, 1995) (good

20  faith relevant to determine deliberateness and seriousness of present violation); *FTC v. Patriot*

21  *Alcohol Testers, Inc.,* 798 F. Supp. 851, 860 n.3 (D.Mass. 1992) ("Although ... Prall's purported

22  good-faith belief about the validity of the representations concerning insurance discounts is not

23  material in determining whether such representations violate [Section 5(a) of the FTC Act], it is

24  material in determining whether he can be held personally liable for such representations").

25      **3.**     **THE INGREDIENTS HAVE ACTUAL WEIGHT-LOSS PROPERTIES**

26        According to the FTC, the product is worthless. That is simply not the case. Consistent

27  with David Raff's research and experience, the HNP Defendants' expert witness, Lawrence

28

3330055-2

1  Cheskin, M.D., F.A.C.P., F.T.O.S.[2] agrees that the ingredients in the product contribute to weight

2  loss.

3          Dr. Cheskin's expert report (Lustigman Decl., Ex. N), his discovery responses (Lustigman

4  Decl., Ex. O) and his deposition testimony (excerpted at Lustigman Decl., Ex. P) make it clear

5  that the product's ingredients promote weight loss.

6          Specifically, Dr. Cheskin testified that two of the ingredients in the product, citrus

7  aurantium ("CA") and hydroxycitric acid ("HCA") produce positive effects as in appetite

8  suppression,  thermogenesis and fat oxidation. Lustigman Decl., Ex. N at ¶3.2.1.  Dr. Cheskin

9  agreed that the product will have weight-loss effects in excess of a control group without changes

10  in diet or strenuous exercise.  *Id.* at ¶3.3.

11          Dr. Cheskin's subsequent discovery production supported his conclusion with well-

12  regarded studies from scientific literature which concludes that the ingredients in the product

13  inhibit lipogenesis-- the process by which the body converts carbohydrates into fat. *See, e.g.,*

14  Lustigman Decl., Ex. O at CHESK000038 ("HCA reduces the availability of acetyl-CoA, the

15  building block for fat synthesis").

16          In his deposition, Dr. Cheskin testified that HCA inhibits carbohydrates "regardless of what

17  the substrate or source of the carbohydrate is." Lustigman Decl., Ex. P at 17:18-21 and that CA is a

18  stimulant that can "increase energy burning, thermogenesis and decrease appetite" Lustigman

19  Decl., Ex. P at 18:22-19:2.  Dr. Cheskin agreed that there have not been studies on the product itself,

20  only the underlying ingredients, but this fact does not detract from the value of these studies in

21  demonstrating that the W8-B-Gone ingredients are valuable for reducing weight.

22          Dr. Cheskin disagreed with the Commission's expert, Dr. Edward Blonz, who concluded

23  that there is no scientific evidence concerning the product ingredients' beneficial effect on body

24  weight. Lustigman Decl., Ex. N at ¶3.6.  He also discussed how Dr. Blonz's report confused calorie

25  _____

26  [2] Dr. Cheskin has served as an Assistant Professor of Medicine at the Johns Hopkins University School of
   Medicine and the School of Public Health. He is Associate Director of the Global Obesity Prevention Center at
27  Johns Hopkins. Dr. Cheskin has published over 100 peer-reviewed articles, over 40 book chapters and six books.
   Since 2008, he has been teaching a course at the School of Public Health entitled "Critical Analysis of Popular
28  Diets and Dietary Supplements.

24

1    deficit with body weight change. *Id.* at ¶3.7. This disagreement creates a factual dispute between

2    experts.

3         Dr. Cheskin concluded that even if the product contributed to just a 5% body weight loss,

4    that is a medically significant benefit because that often results in improvements or disappearance

5    of such conditions as hypertension, hypercholesterolemia and type-2 diabetes. *Id.* at ¶3.8.

6         Therefore, without reference to the claims made by Crystal Ewing, purchasers nevertheless

7    received a valuable product that assisted in weight loss, which is why so many of them never

8    requested refunds. In fact, the number of reorders, 6500, exceeds the number of consumer

9    complaints.

10        All of the foregoing information shows the Raffs' lack of direct involvement in the conduct

11   at issue, the absence of any bad faith on their part and the considerable evidence that the products

12   assist in weight loss even if the advertised claims are unsubstantiated. Because of this, the

13   Commission's summary judgment motion fails to meet its burden of showing the Raffs can be held

14   individually liable for restitution.

15   **D.    THE COMMISSION OVERSTATES
            THE AMOUNT OF THE ALLEGED CONSUMER HARM**
16

17        The Commission's simplistic calculates the amount of alleged consumer loss as

18   $2,509,876.15. This figure is vastly overstated because it does not take into account multiple

     factors that require a reduction.
19

20        As shown above, the HNP Defendants have submitted evidence that conservatively shows

21   satisfied consumers represent 20% of the total purchases of W8-B-Gone and Quick & Easy.  Based

22   on repeat purchases of just over $312,000.00, the amount of product purchased by demonstrably

23   satisfied customers is estimated at $500,000.00. The reliability of this calculation is confirmed by

24   its consistency with 20% of the Commission's total figure of $2,509,876.15.  At a bare minimum,

     Ninth Circuit jurisprudence requires a significant reduction in the Commission's calculations based
25
     on these repeat purchases.
26

27        In determining whether to award equitable monetary relief, the Court must consider

28   evidence of satisfied customers. *FTC v. Kuykendall*, 371 F.3d 745, 766-67 (10th Cir. 2004)

     (defendants must have the opportunity to introduce evidence of refunds and satisfied customers in

1  determining amount of monetary relief); *FTC v. Security Rare Coin & Bullion Corp.,* 931 F.2d

2  1312, 1316 (8th Cir. 1991) (deducting current value of coins from damages owed by defendant for

3  making false representations during sales to consumers); *FTC v. Amy Travel Svcs., Inc.,* 875 F.2d

4  564, 572 (7th Cir.), *cert. denied,* 493 U.S. 954 (1989) (court correctly acknowledged the existence

5  of satisfied customers in computing amount of monetary relief))

6        In the specific context of FTC cases, other courts have significantly reduced damages when

7  consumers are conferred even a minimal benefit from their dealings with a defendant.  Two nearly-

8  identical decisions from sister courts in this circuit, *FTC v. Wetherill*, 1993 WL 563621 (C.D. Cal.

9  May 14, 1993) and 1993 WL 264557 (C.D. Cal. June 10, 1993) are highly instructive. The

10  defendants sold products such as cosmetics, perfume and cheap jewelry. 1993 WL 264557 at *5. It

11  was determined by default that such items were sold by false representations concerning prizes that

12  would be awarded to purchasers. *Id*. at *1-2. The Commission contended the appropriate remedy

13  was the total amount of money sent by consumers to the defendants, $58,662,621. *Id.* at *5.  Even

14  though "products received by the consumers have virtually no market value," the court awarded

15  only a very small fraction of the relief sought by the Commission, namely the amount of the unjust

16  enrichment, (which totaled about $3.7 million between the two opinions) because "the consumers

17  did have use of the products and the present market value of the products in question cannot be

18  measured." *Id.* at *5-6.

19        The court's approach in the *Wetherill* decisions is by no means isolated or unique. *See also*

20  *FTC v. Solomon Trading Co., Inc.,* Civ. 91-1184-PXH-SMM, 1994 WL 421478 at *6 (D. Ariz.

21  June 28, 1994) (value of artwork should be deducted from damages award against owner who

22  falsely represented value of the art when selling it to consumers); *FTC v. Magui Publishers, Inc*.,

23  *No.* Civ. No. 89-3818 RSWL(GX), 1991 WL 90895 at *12 (C.D. Cal. Mar. 28, 1991) (deducting

24  from damages award the defendants' costs of producing falsely advertised Dali etchings and

25  lithographs), *aff'd,* 9 F.3d 1551 (9th Cir. 1993).

26        The repeat order statistics compiled by David Raff indicate a high percentage of customer

27  satisfaction with the product. In this case, the value of the product, which does aid in weight loss, is

28

26

1   precisely the same kind of benefit conferred upon consumers that reduced damages awards in the

2   cases cited above.

3          Consistent with David Raff's personal experience with the product, there was a very

4   significant rate of customer satisfaction: there were 6,500 repeat orders covering both W8-B-Gone

5   and Quick & Easy that have been confirmed. *See* Raff Declaration at ¶7. The total revenue from

6   these repeat customer purchases is $312,007.02. *Id.; see also* Lustigman Decl., Ex. C (Murphy

7   Deposition) at 195:14-17. The number of repeat purchases exceeds 10% of total product orders.

8   *See* Raff Declaration at ¶17. It also exceeds the number of consumer complaints. *Id.* at ¶18.

9          Even this figure significantly understates the true degree of customer satisfaction because it

10  does not include the original purchases (which are still being calculated, pending a ruling on the

11  HNP's request for an extension of time to file this opposition). When the as-yet uncalculated

12  original purchases underlying the repeat purchases are taken into account, the figures are likely to

13  total 11,000 purchases comprising $500,000 in revenue, or about 20% of all purchases for W8-B-

14  Gone and Quick & Easy. *See* Raff Declaration at ¶16.

15         As shown by the significant amount of repeat purchasers, the amount of restitution sought

16  by the Commission is overstated by 20%, or approximately $500,000. To be clear, the HNP

17  Defendants should not be liable for any amount at all, as the Commission has not met its burden of

18  proof on this motion. At the very least, significant questions of material fact going to liability and

19  damages cannot be determined prior to trial.

20

21                       **<u>CONCLUSION</u>**

22         For all the foregoing reasons, the Federal Trade Commission's motion for summary

23  judgment should be denied in its entirety with respect to defendants Health Nutrition Products,

24  LLC, David Raff and Howard Raff.

25

26

27

28

3330055-2

Respectfully submitted,

_____
Charles H. McCrea, Jr.
**HEJMANOWSKI & McCREA LLC**
520 South 4th Street, Suite 320
Las Vegas, NV 89101
Telephone (702) 834-5262
Fax: (702) 834-5262
E-mail: chm@hmlawlv.com

Andrew B. Lustigman (admitted pro hac vice)
**OLSHAN FROME WOLOSKY LLP**
Park Avenue Tower
65 East 55th Street
New York, NY 10022
Telephone: (212) 451-2258
Fax: (212) 451-2222
E-mail: alustigman@olshanlaw.com

*Attorneys for Defendants Health Nutrition*
*Products, LLC, Howard Raff, and David Raff*

\*\*\*

## CERTIFICATE OF SERVICE

I, Andrew B. Lustigman, hereby certify that on the twenty third day of July, 2015, I caused the foregoing document to be served as follows: on the Federal Trade Commission and on remaining counsel of record via CM/ECF; and on Ricki Black, appearing *pro se*, via first-class United States mail to 2603 S.W. 28th Terrace, Cape Coral, FL 33913.

*/s/ Andrew B. Lustigman*_____
Andrew B. Lustigman

3330055-2