UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 2:14-cv-00683-RFB-VCF |
| Plaintiff, | **ORDER** |
| v. | Plaintiff's Motion for Summary Judgment (ECF No. 73) |
| CRYSTAL A. EWING, *et al*, | |
| Defendants. | |

## I.     INTRODUCTION

Before the Court is a Motion for Summary Judgment by the Federal Trade Commission ("the Commission") and Proposed Order seeking equitable monetary and permanent injunctive relief. ECF No. 73. For the reasons discussed below, the Court GRANTS the Commission's motion and ENTERS the Amended Proposed Order. ECF Nos. 113, 114.

## II.     BACKGROUND

On May 1, 2014 the Commission brought this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain permanent injunctive relief, rescission of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, in connection with the advertising, marketing, and sale of purported weight-loss pills "Citra-Slim 4" and/or "W8-B-Gone" and/or "Quick & Easy." ECF No. 1. The Commission filed an Amended Complaint on May 14, 2014. ECF No. 17. The advertisements made the following representations:

1. Defendants' Weight Loss Product would cause consumers to lose 20 pounds of fat in 16 days without diet or exercise;

2. "Sweden's Top Weight Loss Expert" conducted clinical research that supports these claims; and

3. Defendants provided a 100% nostrings- attached refund policy.

On July 1, 2015 the Commission filed its Motion for Summary Judgment against Defendants Crystal Ewing, Classic Productions, Ricki Black, Health Nutrition Products, Howard Raff, David Raff, Shirley Murphy, and Ronald Boyde. ECF No. 73.

On November 2, 2015, the following defendants entered a stipulation for final judgment: Crystal Ewing, Ricki Black, and Classic Productions, LLC. ECF Nos. 103, 104. The Court entered these judgments after receiving oral confirmation from the parties at the hearing on February 24, 2016. ECF No. 112.

Therefore, the remaining defendants pertaining to the Commission's Motion (ECF No. 73) are: David and Howard Raff, Health Nutrition Products, Shirley Murphy, and Ronald Boyde.

### III.    LEGAL STANDARD

#### A.  Summary Judgment

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Johnson v. Poway Unified Sch. Dist., 658 F.3d 954, 960 (9th Cir. 2011).

Where the party seeking summary judgment does not have the ultimate burden of persuasion at trial, it "has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000). "In order to carry its [initial] burden of

production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Id. If the movant has carried its initial burden, "the nonmoving party must produce evidence to support its claim or defense." Id. at 1103. In doing so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted). However, the ultimate burden of persuasion on a motion for summary judgment rests with the moving party, who must convince the court that no genuine issue of material fact exists. Nissan Fire, 210 F.3d at 1102.

With respect to motions for summary judgment under the FTC Act, "[o]nce the FTC has made a prima facie case for summary judgment, the defendant cannot rely on general denials but must demonstrate with evidence that is 'significantly probative' or more than 'merely colorable' that a genuine issue of material fact exists for trial." F.T.C. v. Gill, 265 F.3d 944, 954 (9th Cir. 2001).

### A. Section 5(a) of the FTC Act

"Section 5(a) of the Act declares unlawful 'unfair or deceptive acts or practices in or affecting commerce' and empowers the Commission to prevent such acts or practices. 15 U.S.C. § 45(a)(1) & (2)." F.T.C. v. Pantron I Corp., 33 F.3d 1088, 1095 (9th Cir. 1994). "[A] practice falls within this prohibition (1) if it is likely to mislead consumers acting reasonably under the circumstances (2) in a way that is material." F.T.C. v. Cyberspace.Com LLC, 453 F.3d 1196, 1199 (9th Cir. 2006) (internal citation omitted). Courts look to the overall impression conveyed by a representation, and not merely to literal truth. Id. at 1200.

### B. Section 12 of the FTC Act

Section 12 of the FTC Act prohibits the dissemination of any false advertisement "for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase in or having an effect upon commerce, of food, drugs, devices, services, or cosmetics." 15 U.S.C. § 52(a)(2).

Pursuant to 15 U.S.C. § 52(b), the dissemination of a false advertisement also constitutes a violation of 15 U.S.C. § 45, prohibiting unfair or deceptive acts or practices in or affecting commerce. The FTC Act defines "false advertisement" as one that is "misleading in a material respect," taking into account the representations the advertisement makes or suggests as well as any material facts which the advertisement fails to reveal. 15 U.S.C. § 55(a)(1). A claim that a product is effective is "false" under Section 12 of the FTC Act "if evidence developed under accepted standards of scientific research demonstrates that the product has no force beyond its placebo effect." F.T.C. v. Pantron I Corp., 33 F.3d 1088, 1097 (9th Cir. 1994). In such a case, a claim that the product is effective constitutes a false advertisement "even though some consumers may experience positive results." Id. at 1100. An advertisement is misleading "only if it fails to disclose facts necessary to dissipate false assumptions likely to arise in light of the representations actually made" by the advertisement. F.T.C. v. Simeon Mgmt. Corp., 532 F.2d 708, 716 (9th Cir. 1976).

### C. Individual Liability under the FTC Act

Individuals are liable for injunctive relief for violations of the FTC Act if they directly participate in the deceptive acts or have the authority to control them. F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1170 (9th Cir. 1997); F.T.C. v. Stefanchik, 559 F.3d 924, 931 (9th Cir. 2009). "Under the FTC Act, a principal is liable for the misrepresentations of his agent acting within the scope of the agent's actual or apparent authority." Stefanchik, 559 F.3d at 930. In addition, an individual defendant's status as a corporate officer or "authority to sign documents on behalf of the corporation demonstrate [that defendant has] the requisite control over the corporation" for the purpose of establishing individual liability for a corporation's acts. Publ'g Clearing House, 104 F.3d at 1170-71.

To subject an individual to monetary liability, there must be an additional showing: that the individual (1) had knowledge of the misrepresentations, (2) was recklessly indifferent to the truth or falsity of the misrepresentation, or (3) was aware of a high probability of fraud and intentionally avoided the truth. Publ'g Clearing House, 104 F.3d at 1171; Stefanchik, 559 F.3d at

931. "[T]he FTC is not required to show that a defendant intended to defraud consumers in order to hold that individual personally liable." <u>Publ'g Clearing House</u>, 104 F.3d at 1171.

## IV.    UNDISPUTED FACTS

The Court focuses its discussion on Defendants David and Howard Raff, Health Nutrition Products, Shirley Murphy, and Ronald Boyde.

### A.  General Background

Beginning in 2007, Defendants advertised, marketed, and sold one identical weight-loss pill under three names: Citra-Slim 4, W8-B-Gone, and Quick & Easy (the "Subject Products"). These products had the same formulation and identical instructions for use.

### B.  Ronald Boyde and Shirley Murphy

Shirley Murphy and Ronald Boyde were employees of the company Classic Productions, LLC ("Classic"). Beginning in 2007, Classic, together with Global Access Management Systems, Inc. ("GAM") began marketing the pill Citra-Slim 4.

The mailer touted the pill's "Amazing RAPID FAT meltdown diet program" and claimed users could lose 16 pounds in 20 days without changing their diet or exercise routine. The mailer prominently featured "Sweden's top weight loss" doctor who cited extensive clinical testing.

In 2010, Boyde and Murphy started a new company, Omni Processing Center ("Omni"). Omni handled customer service, order fulfillment, and refunds for the pills W8-B-Gone and Quick & Easy, which featured the same claims as the pill Citra-Slim 4.

### a.  Murphy

Both as the office manager of Classic, and later, as an owner of Omni, Murphy performed the full range of customer service activities, including taking orders for the products, and responding directly to complaints and requests for refunds.

In some cases, she repeated and reinforced the claims in the advertising by urging people seeking refunds to continue to take the product to see if they might lose weight.

/ / /

/ / /

Murphy received and responded to complaints filed with the Better Business Bureau (BBB). The complaining consumers attached exemplars of the deceptive marketing, and complained about the products' efficacy and wanted refunds.

She dealt directly with consumers who complained about the fact that they had made multiple refund requests and had received nothing.

Murphy delayed refunds and lied about protocols for processing refunds. Only Murphy decided whether, and when to issue a refund. Murphy entered telephone orders for the products using the W8-B-Gone website, where claims were also logged. Murphy did not possess any substantiation related to the claims made for the products.

### b. Boyde

Boyde, a longtime employee of Classic, was a 50% owner and secretary of Omni. He set up and had signatory power over Omni's accounts with Wells Fargo. This included an account that received payments from HNP, including refund allowances, and payments to cover the cost of Omni's services. Boyde was the signatory on Omni's Refund Account. As the signatory for Omni's Refund Account, Boyde was aware of the multiple requests for refunds that had been made by unsatisfied consumers, i.e., consumers who had purchased the products and had failed to lose the promised weight.

Boyde had access to the Atlantis database in which Murphy recorded her notes of calls with consumers complaining about the products and the refund delays.

### C. Health Nutrition Products

HNP was incorporated on October 15, 2010, and marketed the diet pills "W8-BGone" and "Quick & Easy." HNP, together with Omni, sold the pills W8-B-Gone and Quick & Easy beginning in 2010.

### D. David Raff

David Raff collaborated with the company MBE and Defendant Crystal Ewing to market the diet pill W8-B-Gone and Quick & Easy through his company, Health Nutrition Products (HNP), beginning in 2010. He provided mailing lists of consumers to the W8-B-Gone and Quick & Easy common enterprises.

Raff reviewed and approved advertising for the Subject Products, including the W8-B-Gone website and mailers for both products. These advertisements described the pills' "Amazing RAPID FAT meltdown diet program" and claimed users could lose 16 pounds in 20 days without changing their diet or exercise routine. The advertisements also prominently featured "Sweden's top weight loss" doctor who cited extensive clinical testing. Raff also coordinated mailing and ad campaigns for W8-B-Gone and Quick & Easy.

In communicating with the Utah Division of Consumer Protection on behalf of HNP regarding an administrative citation for failure to issue timely refunds for Quick & Easy, David Raff represented himself to be "Marc Henri," HNP's Vice President of Customer Relations.

Using the Atlantis database, David Raff obtained detailed information for W8-B-Gone and Quick & Easy regarding sales, inventory, and the success of the specific mailings lists he had supplied.

HNP's corporate filings with the government of Quebec identified David Raff as the majority shareholder and secretary of the company.

In 2012, HNP prepaid a three-year lease costing $42,423.07 for a BMW for David Raff. In the application for the lease, David Raff represented himself as a "partner" of HNP and indicated he received an annual income from the company of $120,000, over and above the income he received as a mailing list broker.

HNP paid David Raff $177,141.89 for mailing list services he provided through MDI Lists, as well as $372,892.25 between April 2011 and November 2013. Of this latter amount, HNP paid David Raff $272,892.25, ostensibly as compensation for his "consulting services" to the company. This included a payment of $31,401.65 on November 26, 2013, just as the company was going out of business, which was more than double any consulting payment he had received up to that time.

David Raff submitted no invoices for his "consulting" services. Instead, he simply contacted his father and named his price – a price that bore no relationship to the specific activities he had engaged in on behalf of HNP. Howard Raff never questioned his requests. At the end of 2012, David Raff also asked for, and received, $100,000 from HNP for personal uses.

HNP paid David Raff personally for his consulting services more than eight times what the company paid Howard Raff – the claimed owner of the company.

David Raff knew that the purported Swedish weight loss experts did not exist, and that the principals of MBE and HNP featured in advertisements were fabricated.

Apart from some independent online research, David Raff never possessed any studies or other support for the claims in his advertising.

David Raff also had access to the information inputted by Omni into Atlantis showing that numerous consumers had made multiple refund requests and that Omni had failed to provide timely refunds.

### E. Howard Raff

Howard Raff was the owner of HNP, which he established in 2010, and appeared on HNP's corporate papers. He approved and paid for advertising for both products. He was responsible for depositing checks and money orders from consumers into HNP's accounts.

In filing for authorization for HNP to transact business as a foreign corporation with the Florida Division of Corporations, Howard Raff used the name "Howard Bruce."

At the close of HNP's business, Howard Raff paid himself, through his company, Mail Receiving & More, $51,037.65 of the remaining consumer funds.

In filings with the Florida Division of Corporations, HNP identified "Howard Bruce," aka Howard Raff, as the company's "managing member." Howard Raff was the registrant for the Pay Pal Account. He was the signatory for HNP's bank accounts for W8-B-Gone and Quick & Easy.

Howard Raff had no studies to back up the weight loss claims for W8-B-Gone. He also knew the Defendants had concocted the Swedish experts and other persons in the advertisements.

Howard Raff was the point of contact with, and received numerous emails from, PayPal regarding chargebacks sought by consumers, and knew that numerous consumers were dissatisfied with the products and had not received refunds. At the February 2016 hearing, Defendant represented that HNP did not maintain a reserve at PayPal to pay for refund requests. Tr. at 25-26. Further, HNP did not take active steps towards granting or denying refund requests by customers,

or ensuring that the refunds were made in a timely manner, deferring instead to PayPal's procedures. Id.

## V. DISCUSSION

### A. Defendants' Claims

The Court first addresses whether Defendants' claims regarding: 1) claims of rapid and substantial weight loss without diet or exercise; 2) express endorsement and establishment claims; and 3) refund claims violate Section 5(a) of the FTC Act. A practice is prohibited under 5(a), as previously discussed, "(1) if it is likely to mislead consumers acting reasonably under the circumstances (2) in a way that is material." Cyberspace.Com LLC, 453 F.3d at 1199. The Court finds, for the reasons stated below, that the representations were false or, at the least, unsubstantiated, and that the claims were material; therefore, the Court finds that the claims violate Section 5(a).

### 1. Claims Were False or Unsubstantiated

Each of the three claims of weight loss, expert endorsement, and refunds, were false.

Regarding weight loss, the evidence shows that it is scientifically impossible for a consumer taking the Subject Products as directed to experience the rapid and substantial weight and fat loss at the claimed rate—5 pounds every 4 days—without changes to diet and exercise. MSJ, PX 1, Att. T at ¶ 5.c. This finding supported by Defendants' own expert, who found that, while certain ingredients in the pills may assist in weight loss, the claims in the advertisements themselves were false and "poetic license." PX 1, Att. V at 54:7-55:20, 57:10-16. The Defendants' expert further could not find clinical tests conducted on products with similar formulations to the Subject Products, and Defendants admit that they neither conducted nor saw such tests. Id.

Alternatively, the Court finds that HNP's claims were unsubstantiated. To prove a lack of substantiation, the FTC must "show that the advertiser lacked a reasonable basis for asserting that the message was true." Pantron, 33 F.3d at 1096. Regarding claims of weight loss, while David Raff argues he tried the product himself and lost weight, "[a]necdotal evidence, such as testimonials by satisfied patients or statements by doctors that, based on their experience, they

'believe' a drug is effective," does not constitute competent and reliable scientific evidence. Simeon Mgmt. Corp. v. FTC, 579 F.2d 1137, 1143–44 (9th Cir. 1978). In addition, David Raff argues that he independently researched the ingredients in the products. However, David Raff has not in any way claimed or verified he is an expert or otherwise qualified to make these findings. Further, in a later deposition, David Raff testified that this research took place only after HNP began selling W8-B-Gone, "somewhere between 2011 through the end of the course of business." MSJ, HNP Depo., PX 1 - Att. R at 129:8-13.

Regarding the expert endorsement, Defendants admit that none of the Subject Products were invented by doctors Ericksson, Juergen, or Johansson. MSJ, PX 1, Att. Q at 57:18-58:9, 59:8-17, 63:13-14. Defendants admit to fabricating these doctors entirely. PX 1, Att. H, Resp. Nos. 2 and 8.

Regarding refunds, the record shows that customers had to call Defendants multiple times, and sometimes had to contact the BBB or state authorities, or reach out to their credit card companies before obtaining a refund. MSJ, PX 3 at ¶¶ 10-12, Atts. E, and I (Complaint Summaries for W8-B-Gone and Quick and Easy); MSJ, PX 5, ¶ 3, Att. A; MSJ,PX 13 at ¶¶ 6-11; PX 14 at ¶¶ 6-16; PX 15 at ¶¶ 5-9; PX 16 at ¶¶ 6-9; PX 17 at ¶¶ 5-8; PX 18 at ¶¶ 5-8; PX 19 at ¶¶ 6-9; PX 20 at ¶¶ 6-8; PX 21 at ¶¶ 5-7.

## 2. Claims Were Material

A claim is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." Cyberspace.com, 453 F.3d at 1201.

Defendants' weight loss claims, buttressed by express endorsements by fictitious doctors, are presumed material because they are express claims that relate to the purpose and efficacy of the Subject Products. Consumers state that the reason they purchased the Subject Products was to lose weight or that they returned the products because they did not enable them to lose weight. See, e.g., MSJ, PX 17 at ¶ 4; PX 20 at ¶ 5.

Additionally, Defendants' 100 percent no strings attached refund claim is express and thus presumptively material. Pantron, 33 F.3d at 1095-96. Consumers purchasing the Subject Products

also indicate they relied on the claim. For instance, one purchaser of Quick & Easy stated that the "no strings attached, money back guarantee" was "one of the reasons I ordered the product." MSJ, PX 3, Att. H at p. 4; see also PX 14 at ¶ 3; PX 15 at ¶ 3.

Therefore, the Court finds that the 1) weight loss claims; 2) express endorsements; and 3) refund claims were false and materially misleading, and therefore violated Section 5(a) of the FTC Act.

### B. HNP's Corporate Liability

#### ii. Section 5(a)

First, Defendant HNP argues that it did not create the advertisements at issue and is therefore not subject to corporate liability for the sale of W8-B-Gone or Quick & Easy under Section 5(a). However, HNP cites to no legal authority that *creation* of the advertisement is required to prove an FTC Act violation under Section 5(a). Rather, Section 5(a) prohibits acts and practices that are likely to mislead customers in a material way. HNP does not dispute that it widely disseminated claims stating that: W8-B-Gone and Quick & Easy would cause consumers to lose 20 pounds of fat in 16 days without diet or exercise; "Sweden's Top Weight Loss Expert" conducted clinical research that supports these claims; and it provided a 100% no strings- attached refund policy.

For the reasons stated previously, the Court finds that HNP's representations regarding W8-B-Gone and Quick & Easy were both 1) misleading and 2) material, subjecting HNP to corporate liability under Section 5. The representations were misleading because they were both false and unsubstantiated. See Pantron, 33 F.3d at 1096.

While Defendant HNP argues that the common enterprise concept cannot extend to HNP, the Court finds that even without a common enterprise, HNP is liable for the full amount of damages stemming from its acts, as it does not dispute that it disseminated claims regarding W8-B-Gone and Quick & Easy.

#### iii. Section 12

Based on the Court's findings that the representations disseminated by HNP regarding W8-B-Gone and Quick & Easy were misleading in a material way, the Court finds that the

representations constitute false advertisements disseminated "for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase in or having an effect upon commerce, of food, drugs, devices, services, or cosmetics." 15 U.S.C. § 52(a)(2).  See 15 U.S.C. § 55(a)(1) (the FTC Act defines "false advertisement" as one that is "misleading in a material respect," taking into account the representations the advertisement makes or suggests as well as any material facts which the advertisement fails to reveal.). The Court therefore finds that HNP also violated Section 12 for disseminating the false advertisements relating to W8-B-Gone and Quick & Easy.

In conclusion, the Court GRANTS the Commission's motion as to HNP for violations of the FTC Act under Sections 5(a) and 12.

### C. David Raff

#### a. Section 5

The Court finds that David Raff is individually liable subject to both injunctive and monetary relief under Section 5.

The Court finds that, based on his actual control over HNP, his reviewing and editing of the W8-B-Gone and Quick & Easy Common Enterprises' advertisements, his coordinating mailings and ad campaigns, and settling at least one claim with Utah's Consumer Protection Bureau David Raff directly participated in the deceptive acts or had the authority to control them, subjecting him to injunctive relief. Publ'g Clearing House, Inc., 104 F.3d at 1170. In addition, the Court notes that David Raff held himself out as HNP's majority shareholder, company secretary, and a partner with an income of $120,000 per year;  HNP's vendors and David Raff's codefendants also regarded him as HNP's co-owner; and he enjoyed the monetary benefits of his participation and control over HNP, receiving a total of $272,892.25 from HNP, by far HNP's highest paid officer.

The Court further finds that David Raff is subject to monetary liability based on his actual knowledge of the W8-B-Gone and Quick & Easy Common Enterprises' deceptions, or at a minimum, his awareness of a high probability of fraud along with an intentional avoidance of the truth.  Publ'g Clearing House, Inc., 104 F.3d at 1171. David Raff knew that the ads featured fake doctors and studies. Nevertheless, he admitted that he made no effort to verify claims that these

studies existed. While David Raff claims to have tested the drugs himself after having marketed the pills, and conducted a limited online search of the pills' effectiveness, David Raff never possessed any studies or other support for the specific claims in his advertising. In addition, David Raff also had access to the information inputted by Omni into Atlantis showing that numerous consumers had made multiple refund requests and that Omni had failed to provide timely refunds; therefore, he at least knew that Utah's consumers were having trouble obtaining refunds.

### b. Section 12

Additionally, the Court finds that David Raff is individually liable and subject to both injunctive and monetary relief under Section 12 for disseminating the false advertisements for W8-B-Gone and Quick & Easy.

Based on the foregoing, the Court finds that, through his position at HNP, David Raff directly participated in the dissemination of the false advertisements, or had the authority to control them, subjecting him to injunctive relief. Publ'g Clearing House, Inc., 104 F.3d at 1170. The Court further finds that, through his position at HNP, which included reviewing and editing the advertisements, and coordinating mailings and campaigns, David Raff is subject to monetary liability based on his knowledge of the representations, reckless indifference to the truth or falsity of the misrepresentation, or awareness of the high probability of fraud and intentionally avoided the truth. Id. at 1171; See also F.T.C. v. Cyberspace.Com LLC, 453 F.3d 1196, 1202 (9th Cir. 2006).

Therefore, the Court finds David Raff individually liable under Sections 5(a) and 12 for injunctive and monetary relief.

### D. Howard Raff

### a. Section 5(a)

Howard Raff was the owner of HNP and appeared on HNP's corporate papers. Howard Raff also, through his alias Howard Bruce, served as HNP's managing member. Howard Raff was responsible for depositing checks and money orders from consumers into HNP's accounts. Howard Raff controlled all of HNP's bank and PayPal accounts. Howard Raff was the point of contact with, and received numerous emails from, PayPal regarding chargebacks sought by consumers,

and thus knew that numerous consumers were dissatisfied with the products and had not received refunds. Howard Raff also received invoices from Omni each month listing the refunds. At the close of HNP's business, Howard Raff paid himself, through his company, Mail Receiving & More, $51,037.65 of the remaining consumer funds. In addition, Howard Raff personally approved and paid for advertising for both W8-B-Gone and Quick & Easy. Like his son David, Howard Raff had no studies to back up the weight loss claims for W8-B-Gone; specifically, he had no way of contacting the doctors or CEOs of the companies responsible for creating the products in question. Tr. 15-16.

Based on these findings, the Court finds that Howard Raff, as the owner, corporate officer, and principal of HNP, directly participated in the deceptive acts or had the authority to control them, subjecting him to injunctive relief. Publ'g Clearing House, Inc., 104 F.3d at 1170. The Court further finds that Howard Raff is subject to monetary liability based on at a minimum, his reckless indifference to the truth or falsity of the misrepresentation, as Howard Raff approved of and paid for the advertisements for both pills and also controlled the PayPal and bank accounts and received monthly invoices from Omni, making him aware of the difficulty customers were having in obtaining refunds. Publ'g Clearing House, Inc., 104 F.3d at 1171.

### b. Section 12

Based on the foregoing, the Court finds that, through his position at HNP, Howard Raff directly participated in the dissemination of the false advertisements, or had the authority to control them, subjecting him to injunctive relief. Publ'g Clearing House, Inc., 104 F.3d at 1170. The Court further finds that, through his ownership of and position at HNP, which included approving and paying for the pills' advertisements, Howard Raff is subject to monetary liability based on his knowledge of the representations, reckless indifference to the truth or falsity of the misrepresentation, or awareness of the high probability of fraud and intentionally avoided the truth. Id. at 1171; See also F.T.C. v. Cyberspace.Com LLC, 453 F.3d 1196, 1202 (9th Cir. 2006).

Therefore, the Court finds Howard Raff individually liable under Sections 5(a) and 12 for injunctive and monetary relief.

### E. Shirley Murphy

### a. Section 5(a)

The Court finds that Omni, which Murphy owned and operated, made false and deceptive claims for W8-B-Gone and Quick & Easy. The Court finds that Murphy, as the owner, corporate officer, and principal of Omni, had the ability to control the claims the company made to consumers and therefore is subject to injunctive relief. Publ'g Clearing House, Inc., 104 F.3d at 1170. Additionally, Murphy, in particular, made false and deceptive claims directly to consumers about the efficacy of the Subject Products and the availability of refunds.

The Court further finds that Murphy is subject to monetary liability based on her awareness of a high probability of fraud along with an intentional avoidance of the truth. Publ'g Clearing House, Inc., 104 F.3d at 1171. Murphy entered telephone orders for both W8-B-Gone and Quick & Easy into the W8-B-Gone website, and was therefore aware of the deceptive claims made on the website. Murphy also responded to the BBB complaints, which consistently referred to the failure of the Subject Products to bring about the promised weight loss and described consumers' repeated and futile efforts to obtain refunds. The complaints also referred to Murphy's recommendations that consumers continue to take the products so that they could see the promised results, and her misrepresentations that refunds needed to be processed by a "billing," "refund," or other separate department; or were subject to further approval. See ECF No. 80-4, customer declarations. There were no multi-step protocols for the issuance of refunds; the decision to issue a refund rested only with Murphy.

### b. Section 12

The Court finds that, through her position at Omni in processing refunds and repeating the various false and deceptive claims, Murphy directly participated in the dissemination of the false advertisements, or had the authority to control them, subjecting her to injunctive relief under Section 12. Publ'g Clearing House, Inc., 104 F.3d at 1170. Although Omni did not disseminate the advertisements for the Subject Products, it provided all customer services, which included among other things, responding to complaints and processing refunds. Instead of providing the promised prompt and easy refunds, however, Omni repeated the false and deceptive refund and weight-loss claims to consumers seeking refunds. Omni deflected refund requests by assuring

consumers that they would lose substantial weight with more time. If that was not successful, Omni promised complaining consumers it would process refunds immediately, but consistently and flagrantly failed to do so. Consumers reported that they had to call the customer service number multiple times to obtain refunds; many were forced to file complaints with the Better Business Bureau or state attorneys general to compel Omni to pay refunds.

The Court further finds that, through her ownership of and position at Omni, Murphy is subject to monetary liability based on her knowledge of the representations, reckless indifference to the truth or falsity of the misrepresentation, or awareness of the high probability of fraud and intentionally avoided the truth. Id. at 1171; See also F.T.C. v. Cyberspace.Com LLC, 453 F.3d 1196, 1202 (9th Cir. 2006). Specifically, the Court finds that Murphy was recklessly indifferent to the truth or falsity of the misrepresentations made in the print materials for the Subject Products and the W8-B-Gone website, yet repeated those false claims to consumers. She also knowingly made false claims regarding refunds.

Therefore, the Court finds Murphy individually liable under Sections 5(a) and 12 for injunctive and monetary relief.

### F. Ronald Boyde

#### a. Section 5(a)

The Court finds that Omni, which Boyde owned and operated, made false and deceptive claims for W8-B-Gone and Quick & Easy. Boyde was a signatory on Omni's refund account, and was able at all times to issue refunds requested by consumers. The Court finds that Boyde, as the owner, corporate officer, and principal of Omni, had the ability to control the claims the company made to consumers and therefore is subject to injunctive relief. Publ'g Clearing House, Inc., 104 F.3d at 1170.

The Court further finds that Boyde is subject to monetary liability based on his awareness of a high probability of fraud along with an intentional avoidance of the truth. Publ'g Clearing House, Inc., 104 F.3d at 1171. Boyde had access to the Atlantis online database, containing customer service records, including entries that the company was behind in providing refunds.

#### b. Section 12

The Court finds that, through his position at Omni as owner and principal, Boyde directly participated in the dissemination of the false advertisements, or had the authority to control them, subjecting him to injunctive relief under Section 12. Publ'g Clearing House, Inc., 104 F.3d at 1170. Although Omni did not disseminate the advertisements for the Subject Products, it provided all customer services, which included among other things, responding to complaints and processing refunds. Instead of providing the promised prompt and easy refunds, however, Omni repeated the false and deceptive refund and weight-loss claims to consumers seeking refunds. Omni deflected refund requests by assuring consumers that they would lose substantial weight with more time. If that was not successful, Omni promised complaining consumers it would process refunds immediately, but consistently and flagrantly failed to do so. Consumers reported that they had to call the customer service number multiple times to obtain refunds; many were forced to file complaints with the Better Business Bureau or state attorneys general to compel Omni to pay refunds.

The Court further finds that, through his ownership of and position at Omni, Boyde is subject to monetary liability based on his knowledge of the representations, reckless indifference to the truth or falsity of the misrepresentation, or awareness of the high probability of fraud and intentionally avoided the truth. Id. at 1171; See also F.T.C. v. Cyberspace.Com LLC, 453 F.3d 1196, 1202 (9th Cir. 2006). Specifically, the Court finds that Boyde was recklessly indifferent to the truth or falsity of the misrepresentations made in the print materials for the Subject Products and the W8-B-Gone website, yet repeated those false claims to consumers.

Therefore, the Court finds Boyde individually liable under Sections 5(a) and 12 for injunctive and monetary relief.

### G. Injunctive Relief

FTC Act Section 13(b) clearly allows for courts to grant permanent injunctive relief: "We hold that section 13(b) gives the Commission the authority to seek, and gives the district court the authority to grant, permanent injunctions in proper cases even though the Commission does not contemplate any administrative proceedings. We hold further that a routine fraud case is a proper case." F.T.C. v. H. N. Singer, Inc., 668 F.2d 1107, 1111 (9th Cir. 1982); See also F.T.C. v. Evans

Products Co., 775 F.2d 1084, 1086 (9th Cir. 1985) (expanding permanent injunctive relief to preliminary injunctive relief: "because the district court has the power to issue a permanent injunction to enjoin acts or practices that violate the law enforced by the Commission, it also has authority to grant whatever preliminary injunctions are justified by the usual equitable standards and are sought.")

Courts may defer to the Commission's guidance regarding remedial orders. "The Commission is the expert body to determine what remedy is necessary to eliminate the unfair or deceptive trade practices which have been disclosed. It has wide latitude for judgment and the courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist." Sears, Roebuck & Co. v. F. T. C., 676 F.2d 385, 391 (9th Cir. 1982) (internal citation omitted).

"(T)he ultimate question is the likelihood of the petitioner committing the sort of unfair practices (the order) prohibit(s). We answer that question by first examining the specific circumstances present in a particular case. Then, giving due deference to the Commission's expertise and judgment, we determine whether there is a reasonable relation between those circumstances and the concern regarding future violations manifested by the Commission's order." Sears, 676 F.2d at 391-92 (internal quotations and citations omitted). "Two factors or elements frequently influence our decision-the deliberateness and seriousness of the present violation, and the violator's past record with respect to unfair advertising practices. Other circumstances may be weighed, including the adaptability or transferability of the unfair practice to other products." Id. at 392.

Having found the above-named Defendants liable for injunctive relief, and upon reviewing the Commission's proposed order, the Court finds that it comports with the standard set forth in Sears in the Ninth Circuit and, paying deference to the FTC, adopts its order in full.

### H.  Equitable Monetary Relief

In addition to permanent injunctive relief, the Court may also issue equitable relief in the form of monetary relief. "[T]he authority granted by section 13(b) is not limited to the power to issue an injunction; rather, it includes the 'authority to grant any ancillary relief necessary to

accomplish complete justice.' This power includes the power to order restitution. A corporation is liable for monetary relief under section 13(b) if the F.T.C. shows that the corporation engaged in misrepresentations or omissions of a kind usually relied on by reasonably prudent persons and that consumer injury resulted." F.T.C. v. Pantron I Corp., 33 F.3d 1088, 1102 (9th Cir. 1994) (internal citations omitted).

"[P]roof of individual reliance by each purchasing customer is not needed." F.T.C. v. Figgie Int'l, Inc., 994 F.2d 595, 605 (9th Cir. 1993). Rather, "[a] presumption of actual reliance arises once the [FTC] has proved that the defendant made material representations that they were widely disseminated, and that consumers purchased the defendant's product…the burden shifts to the defendant to prove the absence of reliance." Id. at 605-06.

"In the absence of proof of 'actual damages,' the court properly used the amounts consumers paid as the basis for the amount Defendants should be ordered to pay for their wrongdoing." F.T.C. v. Gill, 265 F.3d 944, 958 (9th Cir. 2001). "[B]ecause the FTC Act is designed to protect consumers from economic injuries, courts have often awarded the full amount lost by consumers rather than limiting damages to a defendant's profits." Stefanchik, 559 F.3d at 931. "Courts have previously rejected the contention 'that restitution is available only when the goods purchased are essentially worthless.'" Figgie, 994 F.2d at 606. As a result, a product's value should not reduce or preclude equitable monetary relief.

In its proposed order, the Commission argues that the Defendants are liable for $1,544,313.02 for sale of W8-B-Gone, and $957,082.73 for sale of Quick & Easy, which is the amount of injury suffered by consumers who purchased both products less refunds issued by Defendants. ECF Nos. 113, 114. In its original Response, HNP argues they are entitled to an offset of approximately $500,000 to account for satisfied customers, which Defendants calculate based on the number of repeat purchases. ECF No. 94. Therefore, despite the reduction in the equitable amount owed, the Court briefly addresses these arguments here.

The Commission argues that a reduction is inappropriate for two reasons. First, Defendants have not met their burden to show the absence of reliance by their customers. While HNP argues that repeat consumers constitute satisfied customers, the Ninth Circuit has not, unlike other

circuits, held that once the baseline amount of monetary equitable relief is established—for example, by the loss to consumers—defendants must be allowed to provide countering evidence to reduce the amount with, for example, evidence of satisfied customers. Nor has the Ninth Circuit held that repeat customers automatically qualify as satisfied customers. Where another district court in the Ninth Circuit has considered this issue, the court rejected this proposition. See Fed. Trade Comm'n v. Wellness Support Network, Inc., No. 10-CV-04879-JCS, 2014 WL 644749, at *20 (N.D. Cal. Feb. 19, 2014) judgment entered, No. 3:10-CV-4879 JCS, 2014 WL 3805755 (N.D. Cal. Feb. 20, 2014) ("While it may be logical to infer that the customers who reordered the defendants' products relied to some degree upon their experience with the products, the fact that the customers' experiences played a role in their purchasing decisions does not mean or even imply that the customers did not also rely upon the representations in the advertisements when making their subsequent purchases....").

Additionally, the FTC has demonstrated that the Defendants made material misrepresentations that were widely disseminated; that consumers purchased the Defendants' products based on these misrepresentations; and thus, the court may presume that the consumers actually relied upon the advertisements, even when making subsequent purchases. See Figgie International, 994 F.2d at 605–06 ("A presumption of actual reliance" arises when these conditions are satisfied). To rebut this presumption, the Defendants must introduce evidence demonstrating that the repeat customers did not rely on the advertisements. Id. at 606. The Defendants have presented nothing more than mere speculation in this regard and, thus, have failed to meet their burden. Accordingly, the court will not reduce the Defendants' monetary liability by the amount of the sales to consumers who reordered the products.

The Court similarly finds that, because the evidence shows that consumers relied upon Defendants' false advertising, repeat purchases (based upon the same false information) do not show absence of actual reliance to rebut or reduce the award of total consumer loss as required by Figgie. 994 F.2d at 605-06. Therefore, the Court declines to reduce the amount of equitable monetary relief from that proposed by the Commission.

Second, contrary to Defendants' arguments, the Subject Products have no value. As the Court has found, there is no evidence that the products worked at all, let alone as advertised. In addition, the Ninth Circuit has already rejected this reasoning, because "[t]he fraud in the selling, not the value of the thing sold." Figgie, 994 F.2d at 606; see also Kuykendall, 371 F.3d at 766.

Therefore, the Court finds that the full amount of consumer loss is appropriate in this instance, particularly in light of Figgie and Pantron. The Court further finds that a reduction in the award based on repeat customers (based on Raff's testimony and declaration) does not require a reduction in the amount where the repeat customers' purchases were based on the same false information.

The Court therefore ADOPTS the FTC's proposed equitable monetary relief.

Having found the above-named Defendants liable for monetary relief, the Court next considers the permanent injunctive relief the Commission proposes.

## I. Permanent Injunctive Relief

Section 13(b) of the FTC Act allows for courts to grant permanent injunctive relief: "We hold that section 13(b) gives the Commission the authority to seek, and gives the district court the authority to grant, permanent injunctions in proper cases even though the Commission does not contemplate any administrative proceedings. We hold further that a routine fraud case is a proper case." F.T.C. v. H. N. Singer, Inc., 668 F.2d 1107, 1111 (9th Cir. 1982); See also F.T.C. v. Evans Products Co., 775 F.2d 1084, 1086 (9th Cir. 1985) (expanding permanent injunctive relief to preliminary injunctive relief: "because the district court has the power to issue a permanent injunction to enjoin acts or practices that violate the law enforced by the Commission, it also has authority to grant whatever preliminary injunctions are justified by the usual equitable standards and are sought.").

Further, the Ninth Circuit has counseled deference to the FTC's proposed orders. "The Commission is the expert body to determine what remedy is necessary to eliminate the unfair or deceptive trade practices which have been disclosed. It has wide latitude for judgment and the courts will not interfere except where the remedy selected has no reasonable relation to the

unlawful practices found to exist." <u>Sears, Roebuck & Co. v. F. T. C.</u>, 676 F.2d 385, 391 (9th Cir. 1982) (internal citation omitted).

The inquiry as to whether the proposed order is appropriate under the FTC Act is as follows: "(T)he ultimate question is the likelihood of the petitioner committing the sort of unfair practices (the order) prohibit(s), We answer that question by first examining the specific circumstances present in a particular case. Then, giving due deference to the Commission's expertise and judgment, we determine whether there is a reasonable relation between those circumstances and the concern regarding future violations manifested by the Commission's order." <u>Sears</u>, 676 F.2d at 391-92 (internal quotations and citations omitted). "Two factors or elements frequently influence our decision-the deliberateness and seriousness of the present violation, and the violator's past record with respect to unfair advertising practices. Other circumstances may be weighed, including the adaptability or transferability of the unfair practice to other products." <u>Id</u>. at 392 (internal citations omitted).

At the hearing, Defendants raised one main objection to the proposed order as it pertains to Defendant Howard Raff. Namely, Defendant Howard Raff objected to the definition of the term "assisting" to include providing names of potential consumers, which would negatively affect Howard Raff's non-health related businesses. In its Amended Proposed Order, the Commission has defined the term "assisting" to conform with Defendant's objection. Therefore, upon reviewing the Amended Order, the Court finds that the proposed order comports with the standards set forth in <u>Sears</u> in the Ninth Circuit and, paying deference to the FTC, adopts its Amended Order.

/ / /

/ / /

/ / /

## VI.    CONCLUSION

**IT IS HEREBY ORDERED** that [73] Plaintiff's Motion for Summary Judgment is GRANTED.

**IT IS FURHTER ORDERED** that the Federal Trade Commission's [113] Amended Proposed Order for Injunctive Relief is adopted in full.

**IT IS FURTHER ORDERED** that the Federal Trade Commission's [113] proposed equitable monetary relief is adopted in full.


DATED this <u>24th</u> day of October, 2017

_____

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**